James Earl Harvey (aka: Abdul O. Shakur)

D.4.112/C-48884

P.O. Box 7500

Crescent City, Ca 95531

Pelican Bay State Prison

**FILED**

AUG 2 7 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

United States District Court

Northern District Of California

| | |
|---|---|
| James Earl Harvey (aka: Abdul O. Shakur) | Case No. CV08-2894 |
| Pro Per Plaintiff | Civil Rights Act, Title 42 U.S.C. |
| Vs. | 1983. An additional Claim To |
| J. Puente (IGI), Cpt. K. Brandon (ISU) | attach To my pending com- |
| R. Horel (Warden), et al. | plaint. |
| Defendant | |

Statement Of Claim Five

As i stated in my pending complaint the Institutional Gang Investigation Unit (IGI) and the Investigative Service Unit (ISU) For the last 15 years have con-sistently tried To censor my voice/writings. The method is practically the same, and that is the arbitrary and falsifying my writings and reading literature as being gang related, in association To the Black Guerrilla Family (BGF).

Their falsed allegations are in fact a strategy they have been employing To deny me my free speech. Your Honor, Via a hearing/trial i guarantee you will no doubt conclude the arbitrary application of their gang policies are being used To circumvent this Plaintiff first amendment right.

On 3/7/08 i had attempted To send out a letter addressed To Mr. Q. Davis, the content of the letter touched on a number of vital issues concerning and rele-vent To New Afrikan (Black) Prisoners, one of those issues were the rebirth of

1⁴

The New Afrikan Prison Rights Movement, which i know IGI/ISU and the CDCR don't like, so they decided to intercept this letter under the guises it was gang related, by alleging that the term: New Afrikan Revolutionary Collective was an attempt to conceal the true identity of the Black Guerrilla Family (BGF) (see Exhibit CDC-A), i also want you to note the under-lined portion on exhibit CDC-A, this is an example of one of their most pre-valent method of operations, they alter the actual contents via their biased in-terpretation with deliberate intent to support their false allegations. They added the word group, i didn't say that, but they added the word group to support their fabricated contention that New Afrikan Revolutionary Collective is a code word for the Black Guerrilla Family (BGF). Your Honor, this didn't come from a confidential informer or information confiscated from the cell of an alleged BGF member, c/o J. Puente: IGI made this up himself to justify his actions, the something he did in claim one, and i have two more administrative complaints pending in the CDCR (Sacramento) concern-ing two more letters he had confiscated under the same method, gang re-lated.

   Your Honor, this method of adding their own interpretation to an issue and then presenting it as the actual confiscated literature/letter is a IGI/ISU common practice, claim two and three in my pending writ is plagued by this practice. For example, i along with Mr. C. Jackson wrote a rule manual governing the behavior of those New Afrikan Prisoners who participate in the George Jackson University (GJU) educational corre-spondence study course. i clear wrote 'No member/participant will par-ticipate in criminal activities, period'. IGI wrote ~~. No member will participate in criminal activities without permission from BGF ~~. i didn't write that, they did, have them (IGI) to send you the Rule Manual and you

2ª

see what i am saying. Your Honor, this is a TGI method, when we file a writ they know most Judges are not going to request to review the actual evidence, they are going to base their decision on whats in our complaint along with their response - unknowing to the Judge (s) is often fabricated.

Your Honor, the CDCR, ISU, IGI and Office of Correctional Safety (OCS) have reduced an entire Movement to gang politics so they can justify confiscating any writings/literature/letters/material that has the following words: 1) New Afrikan, 2) New Afrikan Revolutionary Nationalism (NARN), 3) New Afrikan Revolutionary, 4) New Afrikan Revolutionary Freedom Fighters, 5) New Afrikan Revolutionary Collective, 6) New Afrikan Political Prisoners/POWs. Your Honor, i am a member of a Movement (i.e. New Afrikan Independence Movement), this Movement consist of 30 to 40 different organizations if not more, and thousands of individuals not affiliated with any group. The BGF is just one of many different groups that are affiliated with the New Afrikan Independence Movement, and it wasn't started by the BGF, this Movement was started in 1968 by activists that had became frustrated with both the civil rights and Black Liberation Movement. We are subjected to negative disciplinary reports for participating in New Afrikan Political activities, by reducing the ideology (New Afrikan Revolutionary Nationalism - NARN) and politics of this Movement to gang/criminal activities, ~~and~~ our mere participation becomes a rule violation which can/and have impact our ability to be released into general population from the hole or paroled.

Your Honor, we are the only class/race of prisoners being subjected to this administrative sanctioned discrimination and persecution, and there is a clear distinction, when other races get accused of participating in gang activities there is actually a crime(s)/criminal act taking place (e.g. Money laundering, drug trafficking, ordering violent acts, extortion, etc.), but when they

charge/accuse Me (us) of gang/criminal activities its political, not crimi-nal, For example, approximately six (6) years ago i wrote a pamphlet Titled: The Bell Curve Conspiracy, this pamphlet expose how institutionalized racism can have a genocidal effect on our People, i allowed Two other Brothers To contribute To this work, we were all in the same section, they are both alleged Members of the BGF, the Fact That we come Together and colla-borated on this work it became gang activities, it was confiscated, this is part of claim Two & Three, everything in claim Two & Three Fall under this same process. Another perfect example is when C/O S. Puente ICI and Cpt K. Brandon Isu confiscated a proposal i wrote designed To end hunger/starvation among all children, but New Afrikan/Black children in parti-cular, but look how they describe My activities (see Exhibit XXO) it don't speak of the content, when you read their chrono you will be left with the impression impression That i am involved in some Type of gang/criminal activity, this is also part of my pending writ before you.

   Your Honor, i (we) am part of a larger Movement, and the ~~language~~ language and Political perspective i convey in my writings and not gang politics, this is a deliberate misinterpretation designed To justify our (New Afrikan Politi-cally Conscious Prisoners) discrimination, isolation and persecution.

   Your Honor, i don't expect you To agree with my Political beliefs or the Movement i belong To, i don't expect My Keepers To agree with my beliefs, but i do expect them To respect my Human/and Constitutional rights, i am not violating any Law, My Keepers have decided To criminalize my (our) ideology To cover their True intent To Censor my (our) voice.

   Your Honor, i am going To provide you with a Few exhibits that will prove ~~point~~: 1) My Language and ideology is not isolated To the BGF, 2) That the

4A

New Afrikan Independence Movement is an actual Movement That involves various groups. These exhibits will clearly contradict ICI/ISU false allegations and misinterpretations.

Exhibit NAIM-A: This exhibit will contain an example writ written by a New Afrikan Prisoner in Nevada challenging The court jurisdiction over him as a New Afrikan Citizen; This Petition is relevant because it provides The court with a historical perspective of The New Afrikan Independence Movement (NAIM). I also included The cover sheet To a pamphlet written by a New York Prisoner, not BGF, I also include an introductory note from This same booklet, I point your intention To The underlined portion ~~ New Afrikan Revolutionary Nationalist ~ according To ICI NARN is BGF politics, you will also see Two additional pages, a cover sheet To another pamphlet written by The same author, and page one, The underlined portion clearly prove That The BGF is not The only New Afrikan Revolutionary Nationalist organization, and keep in mind, it is ICI contention NARN is only a BGF idea. Thus justifying Their reasoning for confiscating all material/literature associated with NARN/NAIM. Exhibit NAIM-A alone dispute That lie.

Exhibit NAIM-B: This exhibit will contain The First Three pages of a pamphlet Titled: A Brief History of The New Afrikan Prison Struggle. It was written by a New Afrikan Prisoner That has no connection with BGF ~ I point your attention To page one The underlined portion. The New Afrikan People's Organization (NAPO) is an organization established on The streets with at least 10 different chapters across The country. Also included is a 7 page essay Titled: New Afrikan Political Prisoners and Political Prisoners of War: Internal Contradictions, The author is from The Mid-west, not BGF, he is a Member of The Spear & Shield Collective, another group in The NAIM. Also included is a 6 page document Titled: The Need For

54

Ideological Consistency, written by another Member of the Spear & Shield Collective.

Your Honor, ICI contend that New Afrikan Revolutionary Nationalism is a BGF creation and anything relating to NARN is gang activity, in both exhibit NAIM A & B i provided evidence that NARN is not isolated to BGF, it is the primary ideology of the New Afrikan Independence Movement (NAIM), i also prove that the Movement started during the Slave era and not by BGF, if you look at Exhibit NAIM-C it will further verify that our Movement is rooted in the Slave ~~rebel~~ rebellion era, we are descendants of those who searched for true independence, we are not a Black separatist Movement or an Anarchist Movement, i've provided you with enough evidence to effectively dispute any Misinterpretations. The NAIM is not a prison Movement, it is a Movement that has its own prison Movement, Exhibit NAIM-D is a brief example of the efforts by the New Afrikan Independence Movement (NAIM). Now another prevailing Misconception concerning the NAIM, it is an anarchist Movement i think i have proven that to be untrue as well, we believe in Government, but a Government that is going to represent our best interest, Exhibit NAIM-E not only speak about our own Government, but it will also provide you with a glimpse of the different type of People that are members in this Movement, from Lawyers to Professors, to community Activists and yes Prisoners. And we are not only white, we have White Supporters/members, the White separatist Movement don't allow any Person of Color to be a Member, contrary to ICI/government interpretations we are not only White see Exhibit NAIM-F.

Your Honor, exhibit NAIM-G reflect other groups inside NAIM. Exhibit NAIM-H contain the New Afrikan Declaration of Independence and the New Afrikan Creed. Your Honor, exhibit NAIM-I is an article i wrote about three years ago, this letter (Claim Five) that was confiscated its

contents were similar to the contents in this article.

Your Honor, all these exhibits are also relevant to claim two and three of my pending civil complaint, all that literature/property confiscated in claim two and three was confiscated under the same false interpretation. Your Honor, what you need to understand is among other New Afrikan Prisoners have been penalized for writing about these things listed in my exhibits, ICI/ISU & OCs has reduced our ideology, political views and history to gang activities, and when we write about New Afrikan Revolutionary Nationalism (NARN) or when they find the literature in our cells they accuse us of being involved in gang activities which are use to deny us parole or release from the hole i.e. security Housing Unit), we are the only class/race of prisoners being subjected to this official-sanctioned censorship.

The same two officers involved in claim one (i.e. J. Puente and Cpt. K. Brandon) are also the same responsible for confiscating this letter.

Relief Requested:

## Claim Five

4/o J. Puente (ICI) initiated this process, i seek punitive damages: _____

Cpt. K. Brandon (ISU) was/is in a position to correct this violation, but failed to do so, for his negligence i seek punitive damages: _____.

Warden R. Horel also had the opportunity to correct this violation but fail to do so, i seek punitive damages: _____

The Director of Corrections is held to a higher standard(s), He/she decisions can & will impact an entire prison system, his refusal to intervene is equivalent to giving sanction to constitutional/human rights violations, i seek punitive damages: _____

I also seek summary judgement in this claim and the return of my letter.

Your Honor, look at all these claims as a whole, not individually, they are all connected. aka: Abdul O. Shakur ~ 8/19/08 ~ James Earl H____

7A

STATE OF CALIFORNIA

**INMATE/PAROLEE APPEAL FORM**

CDC 602 (12/87)

PELICAN BAY STATE PRISON
SECURITY HOUSING UNIT
DEPARTMENT OF CORRECTIONS

Lo  ion:  Institution/Parole Region    Log No    Category

1. PBSP    UNIT-400703    3/7

2. _____    2. _____

You may appeal any policy, action or decision which h   a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| James E. Harvey | C-48884 | SHU | D-4-112 |

A. Describe Problem: On 3/4/08 i sent a letter out addressing the issue concerning the New Afrikan Prisoners Rights Coalition Movement which speaks to the need for New Afrikan Prisoners to organize and unite with community-based New Afrikan (i.e. Afrikan Amerikan) grassroots organization. The document you had confiscated was a draft an example of a mission statement which is clearly stated in the letter enclosed with the mission statement. New Afrikan Revolutionary Nationalism is an ideology, not gang politics, and the New Afrikan Revolutionary Nationalist Party don't even exist. The document that was confiscated was clearly an example draft. The

If you need more space, attach one additional sheet.

B. Action Requested: I want my mail to be forwarded and let me know how this out-going mail is going to pose a threat to the institution/and what was gang related about my mail.

Inmate/Parolee Signature: _____    Date Submitted: 3/11/08

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

BYPASS

INMATE APPEALS BRANCH    APR 21 2008    RECEIVED

Staff Signature: _____    Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

BYPASS

Signature: _____    Date Submitted: _____
Note: Property/Funds appeals must be accompanied by a completed
Board of Control form BC-1E, Inmate Claim.

CDC Appeal Number:

MAR 13 2008

First Level    ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other _____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: _____ Due Date: _____

Interviewed by: _____

_____

_____

_____

BYPASS

_____

_____

Staff Signature: _____    Title: _____    Date Completed: _____

Division Head Approved: _____    Returned _____

Signature: _____    Title: _____    Date to Inmate: _____

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

_____

_____

BYPASS

_____

Signature: _____    Date Submitted: _____

Second Level    ☐ Granted    ☒ P. Granted    ☐ Denied    ☐ Other _____

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: 3/13/08    Due Date: 4/24/08
☐ See Attached Letter    *Vanderhof* 4/10/08  R. Brandon Capt.

Signature: _____    Date Completed: _____

Warden/Superintendent Signature: _____    Date Returned to Inmate: 4/10/08

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

On 3/7/08 a letter was confiscated by IGI claiming that the letter was gang-related. They claimed the term New Afrikan Revolutionary collective is a term that describes the Black Guerrilla Family. This is a blatant fabrication to justify the illegal confiscation of my letter because they didn't agree with its contents.

Signature: _____    Date Submitted: 4/14/08

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other _____
☒ See Attached Letter

AUG 1 1 2008

Date: _____

CPC 602 (12/87)

602 continue ~ ~ ~

Confiscation of my out going mail is only another example of the Institutional Gang Investigation unit arbitrarily employing the fabricated gang connection to camouflage their true intentions, censorship and political persecution. This is not a single act, but an ongoing criminal conspiracy initiated by :1. PBSP Administration, 2. Institutional Gang Investigations, 3. Investigative Services unit, 4. Office for Correctional Safety. And 5. California department of corrections, to criminalize New Afrikan Politically Conscious Prisoners, especially those who embrace New Afrikan Revolutionary Nationalism (NARN) as their ideology.

I GI have reduced an ideology to prison gang politics, we are being subjected to their political ignorance and narrowed interpretation of NARN. NARN is an ideology embraced by many, it is not isolated to BGF or alleged members of BGF.

The Black Liberation Movement primary ideology was nationalism and Black Nationalism, inside of that Movement an internal struggle for a new direction erupted, this led to the short lived Black Power Movement and the primary ideology was Revolutionary Black Nationalism (RBN). In 1968 the Black Power Movement evolved into the New Afrikan Independence Movement and the primary ideology became New Afrikan Nationalist Revolutionary or New Afrikan Revolutionary Nationalism. And this can easily be proven.

PELICAN BAY STATE PRISON
SECURITY HOUSING UNIT
UNIT D-4

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

Date:    AUG 1 1 2008

In re:    James Harvey, C48884
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA 95531-7000

IAB Case No.: 0729485        Local Log No.: PBSP-08-00703

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner D. Artis, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

**I APPELLANT'S ARGUMENT:** It is the appellant's position that on March 7, 2008, he sent a letter containing a draft of a mission statement regarding the New Afrikan Revolutionary Collective. The appellant contends that this letter was disallowed as a form of censorship for his political beliefs. The appellant stated his letter was in no way gang-related. The appellant requests that his outgoing mail is forwarded and would like to know what threat his letter poses and what information within the letter is considered gang-related.

**II SECOND LEVEL'S DECISION:** The reviewer found that on April 9, 2008, Lieutenant (Lt.) Vanderhoofven interviewed the appellant concerning the contents of this appeal. During the interview the appellant related essentially the same information that he provided in his written appeal and had no further information to add regarding the issue being appealed. LT Vanderhoofven reviewed the disallowed letter documented on a 128-B (General Chrono) dated March 7, 2008, submitted by Correctional Officer J. Puente, and authorized by Captain K. Brandon. The outgoing letter was addressed to Q. Davis, PO Box 40799, San Francisco, Ca. 94140. Upon review it was determined that each letter did in fact, contain gang-related communication. The second level reviewer examined all pertinent documents including all information received during the second level interview. The appellant's request to have the letters forwarded was denied as the letters did contain gang-related information. The appellant's request that he be informed as to how the information within the letter is considered gang-related communication was granted. The appellant was informed that the letter discusses information which is related to gang activity. The use of the title "New Afrikan Revolutionary Collective" is an attempt to conceal the true identity of the Black Guerilla Family Prison Gang. Based upon the above information, the appellant's appeal was partially granted by the Second Level of Review (SLR).

**III DIRECTOR'S LEVEL DECISION:** Appeal is denied.

**A. FINDINGS:** The Second Level Response is appropriate and the decision is based upon a reasonable penological interest. The appellant has failed to present compelling evidence and convincing argument to warrant modification of the decision reached by the institution. In this case the appellant argues that his out-going mail that contained a Mission Statement regarding the New Afrikan Revolutionary Collective group, that was deemed disallowed, is a form of censorship for his political beliefs. However, the institution clearly pointed out that the letter contained gang-related content as the title "New Afrikan Revolutionary Collective" is an attempt to conceal the true identity of the Black Guerilla Family Prison Gang. The appellant is advised that pursuant to California Code of Regulations Title 15, Section (CCR) 3023 which states: (a) Inmates and parolees shall not knowingly promote, further or assist any gang as defined in section 3000. (b) Gangs, as defined in section 3000, present a serious threat to the safety and security of California prisons. (c) For the purpose of specific gang participant identification, the department categorizes gangs into prison gangs and disruptive groups as defined in section 3000. Therefore, the Director's Level Review (DLR) support's the finding of the institution and finds no cause to intervene.

**B. BASIS FOR THE DECISION:**
CCR: 3023, 3131, 3136, 3137, 3138, 3270, 3380, 3391

PELICAN BAY STATE PRISON
SECURITY HOUSING UNIT

NAME: HARVEY UNIT D-4    CDC#: C48884    HOUSING: D4-112    **CDC 128-B**

On 7/13/2007 correspondence was stopped for the above-named inmate. The mailing is described as follows:

☐ OUTGOING CORRESPONDENCE/ ADDRESSED TO:    ☒ INCOMING CORRESPONDENCE / FROM:

SOJOURNER TRUTH SCHOOL
PRISONER PUBLISHING NETWORK
PO BOX 311
POOLSVILLE, MD. 20837

The correspondence was disapproved in accordance with Section 3136(a) as it pertains to 3006(c):
☒ It violates regulations or local procedures:
   ☒ Promotes gang activities [Title 15, 3023 (a)]
   ☐ Unauthorized business dealings [3024 (a)]
   ☐ Unauthorized inmate to inmate correspondence [Title 15, 3139]
   ☐ Unauthorized inmate to parolee / probationer correspondence [Title 15, 3140]
   ☐ Third party correspondence [OP 205, Attachment 8, #32]
   ☐ Use of fictitious name or address [U.S.C.S. Title 18, Section 1342, OP 205]
   ☒ Other (describe): OP 205, ATTACHMENT 8, #1.
☐ It incites physical harm to a person or group of persons
☐ It incites disruption of the order in a facility, such as riot, escape, strike, etc.
☐ It contains coded messages
☐ It contains obscene or sexually explicit material, or portrays nudity
☒ It is deemed to be a threat to legitimate penalogical interests.
☐ It contains material or literature which would pose a threat to institutional security or the safety of other persons if allowed to be possessed by inmates.
Additional Information: INTENDED FOR DISTRIBUTION OF BGF AFFILIATES.
The disposition of the letter is as follows:
☒ Retained by Investigative Services Unit for investigation / potential disciplinary or court proceedings.
☐ Returned to sender in accordance with Section 3147 (a) (5) (B) or 3147 (a) (6).
☐ Placed in Central File in accordance with Title 15, Section 3147 (a) (7).

Reporting Employee:                    Correspondence Disapproval Authorized By (Captain level or above):

J. PUENTE                              K. BRANDON
Correctional Officer                   Correctional Captain
Institutional Gang Investigations      Investigative Services Unit

Correspondents are personally responsible for the content of each item of mail they send into or out of a correctional facility, Any violation of laws governing mail will be referred to postal authorities and to appropriate criminal authorities. Violations of law, the policies and regulations or of approved facility mail procedures may result in the temporary suspension or denial of correspondence between the persons involved. [Section 3132 (a)]. Inmates may appeal the stopped mail utilizing the departmental appeal process.

cc:    C-File
       AWC File
       Investigative Services Unit
       Inmate
       Sender (incoming correspondence only)

DATE:    7/13/2007    **STOPPED MAIL NOTIFICATION**    GENERAL CHRONO

Exhibit NAIM ~ A

PELICAN BAY STATE PRISON

SECURITY HOUSING UNIT

NAME: HARVEY          CDC#: C48884          HOUSING : D4-112          CDC 128-B

UNIT D-4

On  7/13/2007          correspondence was stopped for the above-named inmate.  The mailing is described as follows:

☐ OUTGOING CORRESPONDENCE/ ADDRESSED TO:     ☒ INCOMING CORRESPONDENCE / FROM:

SOJOURNER TRUTH SCHOOL

PRISONER PUBLISHING NETWORK

PO BOX 311

POOLSVILLE, MD. 20837

The correspondence was disapproved in accordance with Section 3136(a) as it pertains to 3006(c):
☒ It violates regulations or local procedures:
    ☒ Promotes gang activities [Title 15, 3023 (a)]
    ☐ Unauthorized business dealings [3024 (a)]
    ☐ Unauthorized inmate to inmate correspondence [Title 15, 3139]
    ☐ Unauthorized inmate to parolee / probationer correspondence [Title 15, 3140]
    ☐ Third party correspondence [OP 205, Attachment 8, #32]
    ☐ Use of fictitious name or address [U.S.C.S. Title 18, Section 1342, OP 205]
    ☒ Other (describe): OP 205, ATTACHMENT 8, #1.
☐ It incites physical harm to a person or group of persons
☐ It incites disruption of the order in a facility, such as riot, escape, strike, etc.
☐ It contains coded messages
☐ It contains obscene or sexually explicit material, or portrays nudity
☒ It is deemed to be a threat to legitimate penalogical interests.
☐ It contains material or literature which would pose a threat to institutional security or the safety of other persons if allowed to be possessed by inmates.
Additional Information: INTENDED FOR DISTRIBUTION OF BGF AFFILIATES.
The disposition of the letter is as follows:
☒ Retained by Investigative Services Unit for investigation / potential disciplinary or court proceedings.
☐ Returned to sender in accordance with Section 3147 (a) (5) (B) or 3147 (a) (6).
☐ Placed in Central File in accordance with Title 15, Section 3147 (a) (7).

Reporting Employee:                              Correspondence Disapproval Authorized By (Captain level or above):

J. PUENTE
Correctional Officer
Institutional Gang Investigations

K. BRANDON
Correctional Captain
Investigative Services Unit

Correspondents are personally responsible for the content of each item of mail they send into or out of a correctional facility, Any violation of laws governing mail will be referred to postal authorities and to appropriate criminal authorities. Violations of law, the policies and regulations or of approved facility mail procedures may result in the temporary suspension or denial of correspondence between the persons involved. [Section 3132 (a)]. Inmates may appeal the stopped mail utilizing the departmental appeal process.

cc:    C-File
    AWC File
    Investigative Services Unit
    Inmate
    Sender (incoming correspondence only)

DATE:  7/13/2007          **STOPPED MAIL NOTIFICATION**          GENERAL CHRONO

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

Date:      AUG 1 1 2008

In re:   James Harvey, C48884
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA 95531-7000

IAB Case No.: 0729485          Local Log No.: PBSP-08-00703

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner D. Artis, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

**I   APPELLANT'S ARGUMENT:** It is the appellant's position that on March 7, 2008, he sent a letter containing a draft of a mission statement regarding the New Afrikan Revolutionary Collective. The appellant contends that this letter was disallowed as a form of censorship for his political beliefs. The appellant stated his letter was in no way gang-related. The appellant requests that his outgoing mail is forwarded and would like to know what threat his letter poses and what information within the letter is considered gang-related.

**II   SECOND LEVEL'S DECISION:** The reviewer found that on April 9, 2008, Lieutenant (Lt.) Vanderhoofven interviewed the appellant concerning the contents of this appeal. During the interview the appellant related essentially the same information that he provided in his written appeal and had no further information to add regarding the issue being appealed. LT Vanderhoofven reviewed the disallowed letter documented on a 128-B (General Chrono) dated March 7, 2008, submitted by Correctional Officer J. Puente, and authorized by Captain K. Brandon. The outgoing letter was addressed to Q. Davis, PO Box 40799, San Francisco, Ca. 94140. Upon review it was determined that each letter did in fact, contain gang-related communication. The second level reviewer examined all pertinent documents including all information received during the second interview. The appellant's request to have the letters forwarded was denied as the letters did contain gang-related information. The appellant's request that he be informed as to how the information within the letter is considered gang-related communication was granted. The appellant was informed that the letter discusses information which is related to gang activity. The use of the title "New Afrikan Revolutionary Collective" is an attempt to conceal the true identity of the Black Guerilla Family Prison Gang. Based upon the above information, the appellant's appeal was partially granted by the Second Level of Review (SLR).

**III   DIRECTOR'S LEVEL DECISION:** Appeal is denied.

   **A.   FINDINGS:** The Second Level Response is appropriate and the decision is based upon a reasonable penological interest. The appellant has failed to present compelling evidence and convincing argument to warrant modification of the decision reached by the institution. In this case the appellant argues that his out-going mail that contained a Mission Statement regarding the New Afrikan Revolutionary Collective group, that was deemed disallowed, is a form of censorship for his political beliefs. However, the institution clearly pointed out that the letter contained gang-related content as the title "New Afrikan Revolutionary Collective" is an attempt to conceal the true identity of the Black Guerilla Family Prison Gang. The appellant is advised that pursuant to California Code of Regulations Title 15, Section (CCR) 3023 which states: (a) Inmates and parolees shall not knowingly promote, further or assist any gang as defined in section 3000. (b) Gangs, as defined in section 3000, present a serious threat to the safety and security of California prisons. (c) For the purpose of specific gang participant identification, the department categorizes gangs into prison gangs and disruptive groups as defined in section 3000. Therefore, the Director's Level Review (DLR) support's the finding of the institution and finds no cause to intervene.

   **B.   BASIS FOR THE DECISION:**
CCR: 3023, 3131, 3136, 3137, 3138, 3270, 3380, 3391

JAMES HARVEY, C48884
CASE NO. 0729485
PAGE 2

**C. ORDER:** No changes or modifications are required by the Institution.

This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

cc:    Warden, PBSP
       Appeals Coordinator, PBSP

| PELICAN BAY STATE PRISON |
|---|
| SECOND LEVEL REVIEW |

DATE: APR 1 1 2008

Inmate: HARVEY, C48884
Pelican Bay State Prison
Security Housing Unit
Facility D, Unit 4-112

RE:  WARDEN'S LEVEL DECISION          APPEAL:  PARTIALLY GRANTED
     APPEAL LOG NO. PBSP-D-08-00703    ISSUE:   MAIL

This matter was reviewed by Robert A. Horel, Warden, at Pelican Bay State Prison (PBSP). Correctional Lieutenant F. Vanderhoofven conducted the Appeal interview at the Second Level of Appeal Review on April 9, 2008.

All submitted documentation and supporting arguments have been considered, including the interview conducted at the Second Level of Review. Additionally, a thorough investigation has been conducted into the claim presented by the inmate and the documentation evaluated in accordance with PBSP's institutional procedures and the California Department of Corrections and Rehabilitation (CDCR) policies.

## ISSUES

Inmate HARVEY states in Section A of the Appeal Form that on March 7, 2008, he sent a letter containing a draft of a mission statement regarding the New Afrikan Revolutionary Collective. HARVEY contends that this letter was disallowed as a form of censorship for his political beliefs. HARVEY stated his letter was in no way gang related.

In Section B, Action Requested, HARVEY states he would like his outgoing mail to be forwarded and would like to know what threat his letter poses and what information within the letter is considered gang related.

The Informal Level, Formal Level and First Level were bypassed in this appeal.

## FINDINGS

I

On April 9, 2008, Lieutenant Vanderhoofven interviewed HARVEY concerning the contents of this appeal. During the course of this interview, HARVEY related essentially the same information that he provided in his written appeal and had no further information to add regarding the issue being appealed.

Lieutenant Vanderhoofven reviewed the disallowed letter documented on the attached CDC 128-B dated March 7, 2008, submitted by Correctional Officer J. Puente, and authorized by Captain K. Brandon. The outgoing letter was addressed to Q. Davis, PO Box 40799, San Francisco, CA 94140. Upon review it was determined that each letter did, in fact, contain gang-related communication.

Second Level Reviewer's Response
Appeal Log #: PBSP-D-08-00703
Inmate HARVEY, C48884
Page 2

## DETERMINATION OF ISSUE

The Second Level Reviewer has examined all pertinent documents including all information received during the second level interview. HARVEY's request that the letters be forwarded has been DENIED, as the letters did contain gang related information. HARVEY's request that he be informed as to how the information within the letter is considered gang related communication is GRANTED. The letter discusses information which is related to gang activity. The use of the title "New Afrikan Revolutionary Collective" is an attempt to conceal the true identity of the Black Guerilla Family Prison Gang.

## MODIFICATION ORDER

No modification of this decision or action is required.


ROBERT A. HOREL
Warden

NAME:  HARVEY _____  CDC#:  C48884    HOUSING :   D4-112 _____  **CDC 128-B**

On  3/7/2008 _____  correspondence was stopped for the above-named inmate.  The mailing is described as follows:

☒ OUTGOING CORRESPONDENCE/ ADDRESSED TO:        ☐ INCOMING  CORRESPONDENCE / FROM:

Q. DAVIS _____

PO BOX 40799 _____

SAN FRANCISCO, CA. 94140 _____

The correspondence was disapproved in accordance with Section 3136(a) as it pertains to 3006(c):
☒ It violates regulations or local procedures:
    ☒ Promotes gang activities [Title 15, 3023 (a)]
    ☐ Unauthorized business dealings [3024 (a)]
    ☐ Unauthorized inmate to inmate correspondence [Title 15, 3139]
    ☐ Unauthorized inmate to parolee / probationer correspondence [Title 15, 3140]
    ☐ Third party correspondence [OP 205, Attachment 8, #32]
    ☐ Use of fictitious name or address [U.S.C.S. Title 18, Section 1342, OP 205]
    ☒ Other (describe): OP 205 ATTACHMENT 8, #1
☐ It incites physical harm to a person or group of persons
☐ It incites disruption of the order in a facility, such as riot, escape, strike, etc.
☐ It contains coded messages
☐ It contains obscene or sexually explicit material, or portrays nudity
☒ It is deemed to be a threat to legitimate penalogical interests.
☐ It contains material or literature which would pose a threat to institutional security or the safety of other persons if allowed to be
possessed by inmates.
Additional Information: _____
The disposition of the letter is as follows:
☒ Retained by Investigative Services Unit for investigation / potential disciplinary or court proceedings.
☐ Returned to sender in accordance with Section 3147 (a) (5) (B) or 3147 (a) (6).
☐ Placed in Central File in accordance with Title 15, Section 3147 (a) (7).

Reporting Employee:                            Correspondence Disapproval Authorized By (Captain level or above):


_____          _____
J. PUENTE                                          K. BRANDON
Correctional Officer                             Correctional Captain
Institutional Gang Investigations           Investigative Services Unit

Correspondents are personally responsible for the content of each item of mail they send into or out of a correctional facility, Any
violation of laws governing mail will be referred to postal authorities and to appropriate criminal authorities. Violations of law, the
policies and regulations or of approved facility mail procedures may result in the temporary suspension or denial of correspondence
between the persons involved. [Section 3132 (a)]. Inmates may appeal the stopped mail utilizing the departmental appeal process.

cc:     C-File
       AWC File
       Investigative Services Unit       **PELICAN BAY STATE PRISON**
       Inmate                      **SECURITY HOUSING UNIT**
       Sender (incoming correspondence only)    **UNIT D-4**

DATE:   3/7/2008        **STOPPED MAIL NOTIFICATION**        GENERAL CHRONO

DATE FORWARDED TO INMATE:  3/11/08

DEPT. NO. vll

IN THE EIGHTH JUDICIAL DISTRICT COURT OF THE

STATE OF NEVADA IN AND FOR THE

COUNTY OF CLARK

STATE OF NEVADA          )
          plainiff       )
                         )
     -V-                 )          MOTION TO DISSMISS FOR
                         )          LACK OF PROPER JURISDICTION
                         )          OVER DEFENDANT
HAMMURABI IBN ROHO       )
S/N ROBERT JAMES WILKIE  )
_____)

          NOW COMES THE DEFENDANT by and through Himself asking
this HONORABLE COURT TO GRANT THIS MOTION TO DISSMISS FOR
THE following reasons:

(1)       The Defendant is New Afrikans by birth and remained
New Afrikan by choice. As New Afrikan I am A citizen of the
Republic of New Africa a Nation held captive and colonized
by the United States of America and various European Nations
which held original Jurisdiction over the ForeFathers and
founders of the United States of America.

                    COURTS JURISDICTIONAL CLAIM
                    OVER DEFENDANTS IS PROGENA
                    OF INTERNATIONAL BANDITRY

(2)       Defendants Ancestors were Kidnapped from the Afrikan
continent packed into slave vessels transported to Amercia
and enslaved on plamtations located in the Southeastern
portin of the NorthAmercian continent. Defendants Ancestors
began arriving in North Amercia sometime around 1619. In 1776
the United States of Amercia was born. The New white nation
adopted enslavement practices of its European forefathers.
The system of slavery was left in tact. L.Bennett Jr., Before
THE MAYFLOWER (1966)

(5)   In fact the American Constitution, in which was ratified during
the years 1787 thrul789, was an apartheid document which pro-
tected slavery and sheltered the slave trade until the year
1808. U. S. Const. art 1  statute 2, para 3, U.S. Const. art 1-
tatute 9, para 1, U.S. const. art 4, statute 2, para 3;
Scott vs. Sanford, 60 U.S. (19 How) 690 (1856).

(5) The slave trade and the institution of American slavery
brought defendant's anchestors physically within the juris-
diction of the United States of America and within the juris-
diction of it's states. (see Bennett supra).

(6)         Jurisdiction which results from kidnapping and en-
slavement of human beings is illegal.  Such jurisdiction
is a consequence of international banditry and is repug-
nant to the laws and fundemental rights of mankind.  (See
Universal Declaration of Human Rights, Art. 4, International
Covenant on Civil and Political Rights, Art. 8, statutes
1, and 2.)

(7)         Indeed, the U.S. Supreme Court has held that juris-
diction claimed by virtue of a kidnapping by slave traders
under the color of national law or international treaties
is repugnant to international law (United States v. The
Libelants and Claimants of The Schooner Amistad, 15 Pet
518, 10 L.ed 826 (1941).  In the Amistad case, the court
held that a treaty between the United States and Spain
could not deprive Afrikan slaveship rebels from their
human rights to human life and human liberty.  The Court
said these rights were to be respected in accordance with
the eternal principles of justice and international law.

(8)         Contrary to popular misconception the framers of the
United States Declaration of Independence and the founders
of the American Nation were quite aware of the impropriety
of the institution of slavery and also were cognizant of the
humanity of the Afrikan slave.  The unexpurgated version
of Declaration of Independednce submitted for adoption by
Thomas Jefferson in 1776 harshly condemned the King of
England for the British involvement in the slave traffic.
Interestingly enough at the time of this condemnation
Jefferson himself was a slave owner.  (ADVENTURES IN
AMERICAN LITERATURE, from Autobiography of Thomas Jefferson
66, 70 (1968).

(9)         The jurisdiction that the state of Nevada and the
present court now claims over Defendant is politically,
economically, historically and jurisdically derived from
the illegal American Federal and State Goverment occupation
and control of the New Afrikan established via the slave
trade and the institution of slavery.  The slave trade which
was permitted and protected by the United States Constitution
was directly responsible for bringing the Defendant's
Ancestors to this continent.  The constitutional ihstitution
of chattel slavery was abolished in 1865 by the 13th Amend-
ment to the United States Constitution.  The abolition of
slavery in the 13th Amendment constitutionally mandated the
elimination of slavery and all its incidents and badges.
Jones v. Mayer Co., 392 U.S. 409 (1968).  Yet politically,
economically and socially, slavery and its incidents sur-
vived the 13th Amendment.  After the passage of the 13th
Amendment, the United States Goverment failed to institute
land reform (i.e. to divide large plantations between ex-
slaves who had built and maintained these plantations.)
Further, the U.S. Goverment politically and militarily be-
trayed New Afrikans in 1877 after reconstruction.  (The

<u>federal government withdrew union troops from the south</u>
<u>leaving new Afrikans at the Ku Klux Klan and other white</u>
terrorist who seized the government of the south and reestab
lished white wupremist rule.) Moreover the United States
Supreme Court legally sanctioned the betrayal of the New
Afrikan and unchecked terror visited upon the New Afrikan
people in a series of cases which deprived the New Afrikan
of federal protection and legalized the apartheid practices
and laws of Jim Crow States and Federal agencies. US v.
Cruikshank,92 U.S. 542 (1876), U.S. v. Harris, 106 U.S.
629 (1883), Civil Rights Cases, 109 US 3 (1883, Plessy v.
Ferguson, 163 US 537 (1896). The economic and political
betrayal of the New Afrikan by the United States Government,
the terror by the Jim Crow State regimes and the legal sanc-
tion and support by the Courts relagated the New Afrikan
people to semi-slave peonage. One one havd intolerable pre-
wwures arose form the econimic manifistations of the wretched
condition on the semi-slave New Afrikan and military terror
flowed from the Nazi-like regimes which lynched, raped and
murdered blacks with impunity and absoluted denied the New
Afrikan the vote in state and federal elections in Southern
States and in most Northern ones. On the other hand the New
Afrikans efforts to liberate the colonized New Afrikan nation
by establishment of an independant  New Afrikan nation either
in North America or elsewhere was constantly and systemati-
cally suppbressed by the United State Government and the
Governments of the American states. W.E.B. DUBOIS, BLACK
REONSTRUCTION IN AMERICA (1932),I. OBADELE, THE ARTICLE
THREE BRIEF (1973). The total effect of these events forced
New Afrikans to migrate in large numbers into the terri-
torial boundaries of numerous  Western states including the
State of Nevada. F.HENRI, BLACK MIGRATION (1975). In Nevada
the New Afrikan population was met with the same or similar
apartheid practices which they encountered in the Southwe-
stern portion of the North American continent. However the
New Afrikan was able to minimal economic subsustence because
the thirst for low cost labor being experienced by Western
industry and big business tycoons at the time. F. HENRI supra.

10. At no time has the New Afrikan population or their
Afrikan Ancestors knowingly and intelligently consented to
either their forced seperation from the Afrikan continent or
the imposition of the United States or State Jurisdiction over
them. I.OBADELE supra.

11. The jurisdictionclaimed over the Defendant by the
United States and the State of Nevada being an incident of
slavery is in fact violative of the 13th Amendment of the
Constitution and thus cannot be sustained. Jones v. Mayer supra.

12. The captive jurisdiction is also in violation of
International law. As a people New Afrikans are entitled to
the protections of international covenants and laws which
militate against jurisdiction derived form the outlaw insti-
tution of slavery and the slave trade. As a people the New
Afrikan retains all human rights due him by virtue of Uni-
versal law. The United States Constitution ensures the
New Afrikan these rights by way of Amendment XIII to the

United States Constitution. The 9th Amendment establishes that rights not enumerated by the constitution are retained by the people. <u>Griswold v. Connecticut</u>, 381 U.S. 479 (1965) establishes that the ninth amendment was disigned to protect fundamental rights not listed in the Constitution, from governmental infringement. Certainly the human right of the New Afrikan be free of a slave system created jurisdictional calim is a fundamental right to be protected by the 9th Amendment.

13. The United States has obligated itself and its state governments to recognize and observe the human rights of the New Afrikan in signing the United Nations Charter. U.S. President Jimmy Carter most eloquently stated the purported U.S. commitment to human rights in addressing the United Nations of 17 March 1977. At one point Carter said:

> "All the signatories of the UN Charter have pledged themselves to observe and to respect basic human rights. Thus, no member of the United Nations can claim that mistreatment of its citizens is solely its own business.

> "Ours is a commitment, and not just a political posture. I know perhaps as well as anyone that our own ideals in the area of human rights have not always been attained in the United States, but the American people have an abiding commitment to the full realization of these ideals. And we are determined, therefore, to deal with our deficiences quickly and openly. We have nothing to conceal.

> "To demonstrate this commitment, I will seek Congressional approval and sign by the UN convenants on Economic, Social, and Cultural rights. And I will work closely with our own Congress in seeking to support ratification not only of these two instruments, but the United Nations Genocide Convention, and the Treaty for the Elimination of All Forms of Racial Discrimination, as well.

> "The solemn commitments of the United Nations Charter, of the United Nations Universal Declaration for Human Rights (sic), of the Helsinki Accords, and of many other international instruments <u>must be taken as seriously as commercial or security agreements.</u>" (Emphasis added.)

(14)    The United Nations charter requires Universal
respect for and observance of human rights and fund-
amental freedoms.  U.N. Charter Art. 55, para C.  The
charter also obligates the U.S. to respect self-determ-
ination of New Afrikan peoples UN Charter Art. 55.  The
Universal Declaration of Human Rights is the authorit-
ative expression of what Art 55 comprehends in terms
of human rights, self-determination and non-discrim-
ination passed by the U.N. General Assembly.  All these
documents condemn slavery and semi-slave peonage.  As
a treaty in which the U.S. is a party the United Nations
charter must be considered by U.S. and State Courts as
the law of the United States.  Foster v. Neilson, 2
Pet (27 U.S.) 253 (1919).  Moreover, International Law
is the law of the United States unless Congress dec-
lares otherwise, according to the Court in The Paquette
Habaa, The LOLA, 175 U.S. 677, 20 S. Ct. 290.

(15)    The Court in U.S. v. Toscamino, 500 F2nd 267 (1974
2nd Circuit) held that a person brought within the judicial
jurisdiction of a state by fraud or force could not be
lawfully said to be within the jurisdiction of that state
or Court.  The Toscanino case did not specifically address
itself to the massive situation of the New Afrikan,
but there is no sound legal reason why the New Afrikan
should be deprived of the Toscanino rule.

THE GENEVA CONVENTION
DERIVES THE UNITED
STATES AND EACH STATE
OF THE UNITED STATES
OF JURISDICTION IN THE
PRESENT CASE

(16)    The Defendants are citizens of the New Afrikan Nation
in America, the Republic of New Afrika.  This New Afrikan
Nation has existed since approximately 1619 in North America.
(See Appendix A for history of the New Afrikan Nation.)

(17)    The United States of America and the goverments of
the various states of the United States have held the
New Afrikan Nation in a colonial status since 1776.  The
American Nation inherited its control over the New Afrikan
colony from its British forefathers.  Colonialism is the
policy by which a nation maintains or extends its con-
trol over foreign dependencies.  The practice arises from
the acts of cultural and/or economic imperialism by one
nation against a weaker nation or nations.  The New Af-
rikan Colony originated from the acts of Avarice by 17th
and 18th Century European Nations.  Agents of these Eur-
opean Nations invaded Afrika and transported millions of
Afrikans to America.  Some of these Afrikans were enslaved
in North America.  As indicated in Appendix A, these
Afrikans from various nations were amalgamated by the

slave experience into the New Afrikan Nation. The
land on which this New Afrikan Nation amalgamation
occured lies in the Southeastern portion of what is
now called the United States.  The nation's culture,
territorial basis, history, language and economic
life (plantation slavery) was fully formed in 1776
when the United States of America was born and seized
control of the New Afrikan Nation..(Appendix A.)

(18)      Various rebels and revolutionary leaders have
fought--first the British and then the American Nation
for the freedom of the New Afrikan colony since its
inception.  Nat Turner, at the liberation of the nation
when it was a slave colony.  David Walker, and Henry H.
Garnett are a few of the New Afrikan Statesmen who called
for liberation by any means necessary during slavery.
Since slavery liberation movements have been led by
the Ex slave-Bounty Society, Henry Adams, Edwin McCabe,
the Honorable Marcus Garvey, the Honorable Elijah Muh-
ammed, Malcolm X, the Afro-American Blood Brotherhood,
the Revolutionary Action Movement and the Black Panther
Party.  Arm Struggle against colonialism has been waged
in most recent times by the Black Liberation Army, a
revolutionary New Afrikan organization.  The Provisional
Goverment of the Republic of New Afrika and the Afrikan
Peoples Party and the Nation of Islam along with many
other organized political New Afrikan forces have curr-
ently assumed the leadership in New Afrikan push for
independence.  Throughout the existence of the colony
organizations like the Niagra Movement, the NAACP, the
Southern Christian Leadership Council and the student
Non-Violent Coordinating Council have fought for rec-
ognition of the human rights of the New Afrikan and all
other "persons" such rights.  By virtue of the enactment
of these right guarantees into American law they have
frequently been termed civil rights.  Yet the New Afrikan
people seek such rights as human beings and as a people
irrespective of the purported recognition of these rights
in United States legal instruments.  By force of Arms,
protest and diplomacy the New Afrikan has struggled for
human rights before and after the passage of American
civil right Amendments and legislation.

(19)      The struggle of the New Afrikan Nation for self-
determination, and independence has been suppressed
by the United States and its states since the inception
of the New Afrikan independence struggle.  Slave reb-
ellions were suppressed by force of arms, New Afrikan
attempts to maintain independent communities were supp-
ressed at the end of the civil war (See Appendix A),
and New Afrikan liberation movement have constantly been
suppressed by force and sabatoge throughout the 20th
Century.  Most recently the United States Goverment

executed a counterintelligence program geared to dis-
rupt, discredit and distroy the "Black Nationalist
movement in America."  Local and State Goverments all
played a part.  Many local and state police agencies
created their own anti-Black Liberation movement pro-
grams.  These programs involved the murder, incarceration,
defamation, and exile of Black liberation forces.  The
Federal, local and State police and Army, Navy and CIA
Intelligence authorities were conducting a secret war
against the Black Liberation Movement in America.  (SEE
CHURCH COMMITTEE REPORT, U.S. SENATE.)

(20)     The United States and State war effort has involved
a full-scaled attack on the Black population--partic-
ularly an attack on the youth.  Prosons of the state of
Nevada have been disproportionately filled with New
Afrikans who challenge the system or who are victims of
the U.S. War effort.  Flagrant violations of international
human rights and non-discrimination documents and the
Convention on the Prevention and Punishment of the Crime
of Genocide have left large portions of the New Afrikan
population desperate and has often eviscerated New Afrikan
Communities and individuals of the socil and psychological
stability necessary to prevent anti-social and non-pro-
ductive behavior toward one another.  (See W. PATTERSON,
WE CHARGE GENOCIDE (1971).  This behavior which is a prod-
uct of the colonial predicament and the anti-New Afrikan
liberation war increases the number of New Afrikans in
Prisons.

(21)     These New Afrikans both the concious liberation
fighters and the youth who are not conciously engaged
in liberation struggle are incarcerated in large number
in order to defuse and incapacitate the liberation str-
uggle on a permanent basis.  Thus the disproportinate
incarceration rate of New Afrikans is in large part a
secret war measure employed by the United States and
its state and local subdivision, and it is in part
a consequence of the social, physical and psychological
devastation that the colonial war and the colonial system
has visited on the New Afrikan population.

(22)     Inside the penal institutions the impact of colonial-
ism is most intense, as is the active repression of lib-
eration struggle.  Under Prison conditions many prisoners
have rebelled in the last ten years in spontaneous up-
risings against the colonial establishment at its most
repressive point.  These periodic rebellions are man-
ifest strikes for liberation and the rebels who strike
therin are for the duration liberation fighters against
colonialism and for self-determination.

(23)     In the course of suppressing these rebellions the
colonial agents of the state (i.e. the prison Administrat-
ion, and state investigators and police) arrest many
prisoners who were not in or associated with the rebellion.
Such is the situation with the defendant in the present
case.  The arrests of the defendant and the indictment
is made recklessly and wantonly by state agents who are
unable or unwilling to identify the responsible and anx-
ious to crush the will of the prison population by set-
ting examples.  Those arrested are thus prisoners of war
and civilian victims of WAR.  The war waged by the
colonial forces against the colonized population inside
of the prison.

(24)    .    Anti-colonial National Liberation struggle is a
right of the colonized New Afrikan Nation.  In fact
colonialism is an international crime and all colon-
ized peoples.  Res 1514 (XV) of Dec 14, 1960; Res
2708. 14 Dec 1970; 29 Nov. 1974; Res 3382, November
1975; Res 31/34 (30 Nov. 1976); Res. 32/14 (7 Nov.
1977): Res 33/24, December 8, 1978.      :

(25)     All those arrested or captured for fighting against
colonialism are entitled to Prisoner of War status under
the Geneva Convention and are not properly subject to
the jurisdiction of the court or any criminal Court.
(See Geneva Convention of August 12, 1949, and Protocals
I and II adopted on June 8, 1977 by Diplomatic Conference
on Reaffirmation and Development of International Human-
itarian Law Applicable to Armed Conflict, also see App-
endix B.)                                ,

(26)     The Defendant in the present case is alleged to be
combatant against the County Jail authorities who were
maintaining conditions designed to destroy and socially
incapacitate large segments of the New African pop-
ulation in violation of the Self-Determination Dec-
laration and the Convention against the Crime of Genocide.
If the state allegations were true defendant would be
entitled to the protection of the Geneva Convention as
Prisoners of War and could not be tried in Criminal
Courts.

(27)     The Defendant is actually not responsible for the
actions alleged by the prosecution.  Yet the Defendant
was and is a civilian victim of the state's attempt to
supress liberation struggle in the prison.  This attempt
is part and parcel of the states attempt to suppress
the New Afrikan National Liberation Struggle in total.
The Defendant, a Civilian Prisoner of War, is also entitled
to international protection afforded by the Geneva Convention.

WHEREFORE, the Defendant moves this Court to Dismiss this case for lack of proper jurisdiction over the persons of the Defendant or the subject matter of the case.  In alternative the Defendant seeks an evidentiary hearing.  At such a hearing the Defendant would call Dara Abubakari, President of the Provisional Goverment of the Republic of New Afrika and Ethereno Akinshegun, Vice-President of the Provisional Goverment of New Afrika.  These witnesses would testify to the political, historical, social and economic facts stated in this motion and its Appendicies.  The Defense would likewise call Historians Anderson Thompson, and John Henrik Clark and Political Scientist Jake Caruthers to establish the facts noted herein.

Respectfully Submitted

_____

Hammurabi Ibn Roho
S/N Robert James Wilkie

# NATIONAL

# STRATEGY

# OF

# FROLINAN

s/w J. Harvey
C-18395

# FRONT FOR THE LIBERATION
# OF THE
# NEW AFRIKAN NATION

## Introductory Note

Frolinan is initially a cadre-organization of New Afrikan revolutionary nationalist, whose primary objective is to evolve an united strategy and direction amongst the many New Afrikan nationalist formations.  This objective is to further enjoin New Afrikan revolutionary nationalist to accept a position within the front, to develop greater principled unity of action in the New Afrikan Independence Movement (NAIM), in accordance with the National Strategy of Frolinan.

There are many progressive and revolutionary organizations/parties/fronts in the NAIM of local, regional and national significance.  Frolinan recognizes each organization/party/front has a specific and general role in the NAIM, but it is our faith, this role must be formulated in unity and struggle amongst our oppressed New Afrikan masses under the guidance of a **single** national strategy and program.  We believe that with the tactical implementation of a national strategy, which embraces the specific and general cause of NAIM in theory and practice, the various organization/parties/fronts will greatly enhance the overall development of the New Afrikan Independence Movement.

4

threatened, as the national bourgeoisie intensifies their integrationist program on the deaf ear of the U.S. conservatism. The overall roll-back of affirmative action and economic programs that served the needs of the Black masses during the late 60s and throughout the 70s, provides the basis in which the New Afrikan (Black) revolution will be mounted; the socioeconomic contradiction between the owners of the means of production (ruling class imperialist) and the laborers (managers and manual labor) becoming antagonistic - the principle ideal of Black capitalism in juxtaposition in capitalist-imperialism is refuted.

 From a New Afrikan revolutionary nationalist analysis of the developing struggle, dialectical historical materialism must be the basis in which such an analysis serves to manifest an ideology, theory and political program that will strengthen the socioeconomic and political determination of the New Afrikan Independence Movement. In this way, the New Afrikan revolution will not become short-sighted and bend to reformist concessions the national bourgeoisie neo-colonialist - in behalf of their class interest and the interest of colonialism - may throw in the path of the revolution via the Black middle class-petty bourgeoisie and working class. Hence, this New Afrikan revolutionary nationalist analysis must be a class analysis of national significance. It then becomes first to identify the classes of neo-colonial oppression; the national Black bourgeoisie, neo-colonialists are identified as those business people/corporations such as Johnson Publication and Products, Motown music/movie industry, etc. whose economic policy

18



# THE

# THREE PHASE THEORY

# FOR

# NATIONAL

# INDEPENDENCE

**Revised by: Jalil A. Muntaqim**

# THREE PHASE THEORY FOR NATIONAL INDEPENDENCE

"Settle your quarrels, come together, understand the reality of the situation, understand that fascism is already here. That people are already dying who could be saved, that generations more will die or live poor butchered half-lives if you fail to act. Do what must be done, discover your humanity and your love in revolution. Pass on the torch, join us, give up your life for the people."

George Jackson

# INTRODUCTION

Essentially, the course of our struggle has been defensive, marginally organized, and sectarian. There exist across the country hundreds of revolutionary nationalist cadres and formations. Many of these cadres are members or affiliated with the very few organizations that apply the politics of revolutionary nationalism to our peoples national oppression.

Exhibit NAIM-B

# A Brief History Of The New Afrikan Prison Struggle



## by Sundiata Acoli

$3

# A Brief History Of The New Afrikan Prison Struggle

**by:**

Sundiata Acoli
#39794-066
P.O. Box 1000
Leavenworth, Kansas 66048

**Produced by:**

Sundiata Acoli Freedom Campaign, 1992

Exhibit NAIM-C

# A Brief History of the New Afrikan Prison Struggle

*This article was first written at the request of the New Afrikan Peoples Organization (NAPO). Its original title was "The Rise and Development of the New Afrikan Liberation Struggle Behind the Walls." The New Afrikan liberation struggle behind the walls refers to the struggle of Black prisoners, "behind the walls" of U.S. penal institutions, to gain liberation for ourselves, our people, and all oppressed people. We of the New Afrikan Independence Movement spell "Afrikan" with a "k" because Afrikan linguists originally used "k" to indicate the "c" sound in the English language. We use the term "New Afrikan," instead of Black, to define ourselves as an Afrikan people who have been forcibly transplanted to a new land and formed into a "new Afrikan nation" in North America. But our struggle behind the walls did not begin in America.*

## The 16th Century Through The Civil War

The Afrikan prison struggle began on the shores of Afrika behind the walls of medieval pens that held captives for ships bound west into slavery. It continues today behind the walls of modern U.S. penitentiaries where all prisoners are held as legal slaves — a blatant violation of international law.

The conception of prison ideology began to take form as far back as the reign of Louis XIV of France (1643–1715) when the Benedictine monk Mabillon wrote that: ". . . penitents might be secluded in cells like those of Carthusian monks, and there being employed in various sorts of labor."[1] In 1790, on April 5th, the Pennsylvania Quakers actualized this concept as the capstone of their 14-year struggle to reform Philadelphia's Walnut Street jail. No longer would corporal punishment be administered. Henceforth prisoners would be locked away in their cells with a Bible and forced to do *penitence* in order to rehabilitate themselves.[2] Thus was born the penitentiary.

In 1850, approximately 6,700 people were found in the nation's newly emerging prison system.[3] Almost none of the prisoners were Black.[4] They were more valuable economically outside the prison system because there were other means of racial control. During this time most New Afrikan (Black) men, women, and children were already imprisoned for life on plantations as chattel slaves. Accordingly, the Afrikan struggle behind the walls was carried on primarily behind the walls of slave quarters through conspiracies, re-



volts, insurrections, arson, sabotage, work slow-downs, poisoning of the slavemaster, self-maimings, and runaways. If slaves were recaptured, they continued the struggle behind the walls of the local jails, many of which were first built to hold captured runaways. Later they were also used for local citizens.

Shortly after 1850, the imprisonment rate increased, then remained fairly stable with a rate of between 75 and 125 prisoners per 100,000 population.[5] The Afrikan struggle continued primarily behind the slave-quarter's walls down through the issuance of the Emancipation Proclamation. This was a declaration issued by President Lincoln on January 1, 1863, during the height of the Civil War. It declared the slaves free *only* in those states still in rebellion and had little actual liberating effect on the slaves in question. Their slavemasters, still engaged in war against the Union, simply ignored the declaration and continued to hold their slaves in bondage. Some slavemasters kept the declaration secret after the war ended following Lee's surrender on April 9, 1865. As a result, news of the Emancipation Proclamation did not reach slaves in Texas until June 19, 1865. This date, called "Juneteenth," is celebrated annually by New Afrikans in Texas and outlying states as "Black Independence Day."

# Post-Civil War
# To The 20th Century

Immediately after the Civil War and at the end of slavery, vast numbers of Black males were imprisoned for everything from not signing slave-like labor contracts with plantation owners to looking the "wrong" way at some White person,[6] or for some similar "petty crime." Any "transgression" perceived by Whites to be of a more serious nature was normally dealt with on the spot with a gun or rope . . . provided the Black was outnumbered and outarmed. "Black-on-Black" crime was then, as now, considered to be "petty crime" by the U.S. justice system. But petty or not, upon arrest most New Afrikans were given long, harsh sentences at hard labor.

Within five years after the end of the Civil War, the Black percentages of the prison population went from close to zero to 33 percent. Many of these prisoners were hired out to Whites at less



than slave wages.[7] Overnight, prisons became the new slave quarters for many New Afrikans. Likewise the Afrikan prison struggle changed from a struggle behind the walls of slave quarters to a struggle behind the walls of county workhouses, chain gang camps, and the plantations and factories that used prisoners as slave laborers.

# The 20th Century
# Through World War II

From 1910 through 1950, Blacks made up 23 to 34 percent of the prisoners in the U.S. prison system.[8] Most people, conditioned by the prison movies *The Defiant Ones* (starring Sidney Poitier, a Black, and Tony Curtis, a White), or *I Escaped From the Chain Gang* (starring Paul Muni, a White in an integrated chain gang), or *Cool Hand Luke* (starring Paul Newman, a White, in a Southern chain gang) erroneously assume that earlier U.S. prison populations were basically integrated. This is not so. The U.S. was a segregated society prior to 1950, including the prisons; even the northern ones. Most New Afrikan prisoners were sent to county workhouses, Black chain gangs, and obscure negro prisons. Thus, the early populations of the more well-known or "mainline" state and federal prisons — Attica, Sing Sing, Alcatraz, and Atlanta — were predominantly White and male. Whenever New Afrikans were sent to these "mainline" prisons they found themselves grossly outnumbered, relegated to the back of the lines, to separate lines, or to no lines at all. They were often denied outright what meager amenities existed within the prisons. Racism was rampant. New Afrikans were racistly suppressed by both

Exhibit NAIM-C

Insufficient



## Remembering Henry Adams:
## A New Afrikan Leader who Struggled For
## Land and Independence

As revolutionary New Afrikans, Our national culture is the historical struggle to fulfill the mandate of Land and Independence. Our Comrad Yaki stresses to Us that it is extremely necessary that the New Afrikan Independence Movement (NAIM) assert, at every opportunity, its separate (national) identity from all movements which do not seek the establishment. — of a sovereign and independent nation-state for Afrikans in the U.S., because the failure to do so will impede the national liberation struggle. We distinguish Ourselves from false nationalism in all its metaphysical and cultural expressions.

It was Frantz Fanon who made this distinction crystal clear when he said:

I say again that no speech-making and no proclamation concerning culture will turn Us from Our fundamental tasks: the liberation of the National Territory; [and] a continuous struggle against colonialism in all its new forms....

Our distinction establishes Our national identity and culture of resistance. In Our cultural gatherings and during Our rituals We must remember and honor those distinguished New Afrikan leaders who dedicated their lives to Land, Independence, and Self-Government. During slavery/kkkolonialism many of these New Afrikan leaders led escapes and established communities in the woods, mountains, and swamps. Others organized rebellions aimed at freeing slaves and liberating territory from which to build an independent state.

In the reconstruction/neo-kkkolonial era, New Afrikan leaders — *Exodusters* — sought independent land anywhere. One of the Exodusters was the dedicated nationalist leader Henry Adams. Adams was a committed grassroots organizer; he and other New Afrikan men, some ex-union soldiers formed what they called 'the Committee'. As many as 500 New Afrikan men took part in this public clandestine organization. The Committee functioned as a secret intelligence group gathering information on the plight of the New Afrikan masses and assisted the masses with their problems. Committee members were able to relay the concerns of the people because they went into the field and worked with them.

For Adams and other Committee members, working amongst the New Afrikan masses was costly and dangerous; though they organized in a clandestine manner, they were often suspected as being affiliated with the Committee. Once suspected by the 'white league', a kkkolonial terrorist organization, suspected Committee members were fired from their jobs, tortured, or brutally murdered. As a suspected Committee member, one lived under the threat of death. At times, with his pockets empty and a noose hanging over his head, Adams remained committed to the New Afrikan masses.

After working amongst the New Afrikan masses from 1870-1876, the Committee concluded that New Afrikans would remain wretched and terrorized if they remained in the South. In 1877 the Committee became the Colonization Council; the new organization advocated emigration, leaving from the South; and colonization, collective pioneering to acquire Land and establish Self-Government either in Liberia (Afrika) or in Kansas. Until his death Henry Adams was loyal to his vision and pursuit of Land and Independence.

In examining the life of Henry Adams, making the past serve the present, We discover he was a dedicated New Afrikan community organizer. As members of the New Afrikan Independence Movement today, how many of Us are dedicated community organizers and are loyal to the New Afrikan masses? Does Our social practice reflect 'from the masses to the masses'? Are We confined to rhetoric, commandism, tailism, adventurism, or revolutionary intellectualism? Without the New Afrikan masses organized We will never obtain Land and Independence; 'FREE THE LAND' will remain just a battle cry, a dream. The major weakness of the New Afrikan Independence Movement is the lack of skilled cadre who have community organizing capabilities. We must turn this weakness into a strength; let Us internalize the organizing spirit of Henry Adams.

—Cinque Kofi Kinaya

*reprinted from 'New Afrikan Prisoner Bulletin' (March, 1996),* The Freedom Network, NIS&G publishing, 654 Franklin Rd, Pontiac, MI 48341. Cover picture: **Benjamin 'Pap' Singleton, 'Exoduster' & contemporary of Henry Adams who headed the Tennessee Real Estate and Homestead Association.**



Exhibit NAIM~D



**April 1997**                                    **Volume 2 Issue 10**

# New Afrikan POW
# Newsletter



New Afrikan Liberation Front

INSIDE:
1. Letter from the Correspondence Secretary: NANDPPPOW/MXGM Alliance
2. Atiba Shanna's (Yaki) Letter dated 3/14/97:
   a. POW Definition
   b. **NEW AFRIKAN PRISONER ALLIANCE!!!**
3. Herman Bell's Letter dated 3/21/97:
   a. New Afrikan POW Newsletter
   b. POW Definition
   c. Add Khalfani and Abdul Shakur
4. Malik El-Amin letter dated 3/9/97: Revolutionary Greetings to Comrades
5. Mutulu Shakur's letter dated 4/2/97: POW Definition
6. Kojo Sababu's letter dated 3/30/97: Yes vote
7. Bashir Hameed's letter dated 4/15/97: Brotha gives folks his Salaams

### New Afrikan Network
### in Defense of
### Political Prisoners and POWs
P.O. Box 90604
Washington, D.C. 20090

To:      PP/POWs
From:    Kamau Jihad

Love, Peace & Revolutionary Greetings:

NANDPPPOW/MXGM Alliance & Manpower/Resource Issue:
The primary purpose of this letter is to inform the brothers behind the walls
that the New Afrikan Network in Defense of Political Prisoners and POW
(NANDPPPOW) has united with the DC unit of the Malcolm X Grassroots
Movement (MXGM). Hopefully, this union well resolve the limited
manpower and resource concerns mentioned in previous issues of the
newsletter. NANDPPPOW is now nationally under the umbrella of NALF
and locally under the umbrella of MXGM.

Transcribing PP/POW Correspondence:
Sometimes it is difficult to understand the script of various brothers who
write to the newsletter. In those cases, i may type "..." in place of the text that
i was not able to decipher or, if it is a single word, i may drop the word
completely if it does not appear to change the essence of the brother's
message. Where possible, please type. It is easier to correct typos than it is to
transcribe handwriting.

Update POW Subscriber List:
Bashir Hameed and Malik El-Amin are now active subscribers to the
newsletter. Thus far 14 brothers have acknowledged receipt of the newsletter.
We are glad to welcome both of you to the family.

Free the Land & All PP/POWs!



3-14-97

Rev. Greetings Comrades:

   i want to address two issues:
      1) POW definition, and
      2) the formation of a "**PRISONER ALLIANCE**" and a companion support network--both as
            integral components of the NAIM (i.e., with respect to the PG and the NALF).

## POW DEFINITION

   Why do We need to expand or redefine "POW"?  Why are We spending so much time on the issue of redefining "POW" when not enough time is being spent to build organization among New Afrikan prisoners, and even less time spent toward building a support movement for New Afrikans prisoners in New Afrikan communities?

   Moreover, We all know that We should devote more of our energies in struggles addressing the wide range of issues facing the movement and New Afrikan people.  Our concerns shouldn't be bounded by prison walls--We're not simply "prisoners" no matter how defined--We're politically conscious and socially responsible citizens of the nation, and We do and should help to lead the nation's struggle on all fronts.

   One of my concerns with the issue of redefining "POW" is that We keep politics in command, and maintain our ideological and political integrity.  This is especially important when the process of redefinition is an eclectic one, with at least one aim of trying to bring some of our allies under the new definition and for reasons that may be better served by other means.

   i can't say it strongly enough:  i share what i think is the concern of some comrades that We not "abandon" our allies, and/or that We do all that We can to help increase support for them (and, that We strengthen our political and organizational unity with them, and not let any unprincipled attacks be launched against them from inside or from outside of our movement).

   However, We shouldn't seek what may appear to be short term gain, at the expense of fundamental principles, risk undermining strategic needs of ALL imprisoned activists and our respective movements.  In this context, maybe We need to ask:  Is there really a need to expand the definition of "POW" or is it more a matter of reaffirming and strengthening our solidarity with--and helping to build greater support for--our allies?  If the latter is the case, then i'd suggest We seek other, better ways to do these things.

   With that said:  If there are legitimate ways to identify some of our allies as POWs, then i'm open to that.  It should be understood, however, that it may not be possible to include all allies under even an expanded definition.  For example, the Ohio Seven have defined themselves as "PPs" and stated that they were NOT AN INTEGRAL PART OF ANY NATIONAL LIBERATION MOVEMENT.  On the other hand, there are some individuals and/or groups for whom a strong argument could be made for their POW classification, because under the Third Geneva Convention and Protocol I, they were "volunteer corps acting under a Party to the conflict", and/or they professed "allegiance to a government or authority not recognized by the Detaining Power", while "under a command responsible to" a party to the conflict--at bottom, say, We're talking about their being ultimately responsible to, say, the PG, and/or their being conscious (naturalized) citizens.  (It's long been said that there was a least one "white member of the BLA"--and any/all captured members of the BLA should be regarded as a POW.  The criteria is that the captured person is either a national, or someone professing allegiance to one of the organized formations representing New Afrikan people.

   No doubt there are some among us who question some or all of the international law and/or politics that bound some of our efforts--and these are legitimate concerns.  But We are somewhere between a rock and a



hard place in this regard. On one hand, We may want or need to influence changes in the international legal and political situations, but there is a context within which We must work to do this. To begin with, We must study the international law and the international political situation, and on such a basis be in a better position to determine what We may be able to change, and what We can't--and may not even want to change. We must collectively--that is, each individual as well as the body--know what OUR obligations are under this law, and be better able to use it to our advantage. On this note, let me move on to the second subject that i want to raise.

## THE "NEW AFRIKAN PRISONER ALLIANCE" AND ITS NATIONAL SUPPORT NETWORK

In the August "96 issue of the Newsletter, i urged that We begin to discuss the creation of a "New Afrikan Prisoner Organization"--We can name it whatever We will, but the function of such an organization is what's important. For over twenty years We've been trying to build such an organization, and We've come up empty--despite the obvious need and potential ability to accomplish the task. Now, in some ways, We're on that road again, even tho in a rather unconscious way, i.e., the way We've been building on the basis of this Newsletter, and the work with the Front.

Let me use something from the Front as a basis for further discussion of this issue. In response to a proposal regarding international work, one of the Front's member organizations issued an initial--and then a revised--position, which read, in part:

> "...We disagree with placing ultimate responsibility
> for approving programs behind the walls. Albeit We
> all have tremendous respect, admiration and confidence
> in our Political Prisoners/POWs, the authority system
> for the NALF must be based upon a consensus of
> organizations, not individuals. Political Prisoners,
> Exiles and POW input into the decision making of NALF
> should flow through whatever organization with which
> the brother or sister is affiliated." (Initial response.)

> "...We believe that PP/POWs should have a voice
> in the international work, however We do not agree
> that PP/POWs should have special status to approve
> international programs any more than any other members
> of the Front. PP/POWs should have a voice in the
> Front either through a PP/POW organization or through
> existing organizations which they may designate to
> represent them." (Revised response.)

Now i've not mentioned the organization making this response because i don't think that's what important here. What's important here is the point made regarding how PP/POWs should be represented within the Front--but it's a point that is valid not only with regard to the Front, but with regard to the entire Movement: What means will captured combatants AND other captured citizens use when they want to speak with one voice, and to act as one body?

Even if each individual came to be represented by one of the existing member organizations of the Front, this wouldn't negate the need for some type of apparatus that would represent the particular needs and interests of captured citizens, e.g., our equivalent to the Puerto Rican National Committee, or to the PLO's committee for Defense of Palestinian Prisoners... Our Movement needs to be able to speak with one voice with regard to our captured citizens and combatants!

i really feel like i'm arguing a point here needlessly, because i seriously doubt that anyone would disagree with the general need for such a centralized apparatus. However, i was a little dismayed when no

one responded to the suggestions put forward in the August "96 Newsletter, Maybe if i can OUTLINE the suggestion in a little more detail, it will give us a basis for further discussion.

   The seeds for the "Prisoner Alliance" are already planted and represented by the subscribers to the Newsletter, and the initial procedures established for admitting members, making decisions, and delegating tasks. Of course there remain a number of things to be discussed in this regard, and here i'd suggest that We be guided by a desire to keep everything as simple as possible, both with regard to principles and procedures, as well as with regard to structure. Above all, keep in mind that general non-partisan/non-sectarian character of the formation We want to build, and the work that We want to do, as a New Afrikan "Prisoner Alliance".

   The seeds for the "National Support Network" are also already planted, represented especially by the Network, and Crossroad, i.e., and existing organization, functioning as a national "network", and an existing newsletter originally designed as a public voce of the New Afrikan combatant, and a vehicle to help build a national and international support movement and service apparatus for New Afrikan citizens and combatants.

   The keys We're missing are labeled "cooperation" and "coordination". Cooperation between the captured citizens and combatants, and any existing defense or support committees that they have; cooperation from the existing outside organizations within the NAIM; formal agreement from all to act as a NETWORK; and creation of/deciding upon a 'center' for the network, to coordinate all activity with regard to New Afrikan captured citizens and combatants.

   The essential functions of the network's "center" would be the production of a newsletter or newspaper; the collection/production of other literature and audio/visual materials and putting them to use; coordinating speaking tours and other events; creating the systems to serve the needs of the captured citizens and combatants and their families, etc. The "center's" task is made easier through the cooperation of the captured and the existing support/defense committees and NAIM organizations--all, part of the "network".

   Again, i'm suggesting that We begin to discuss this proposal, in depth and from all sides.

ReBuild!
Free The Land!

Yaki

Exhibit NAIM-E



## A Touch of History
# REPARATIONS: POSSIBLE THROUGH UNITY

### by Atty. Adjoa Aiyetoro
#### National N-COBRA Co-Chairperson

The movement is expanding to obtain reparations for slavery and the years of racial brutalization of Africans in America, including racial discrimination. A cooalition was formed in November 1987 which has as its purpose to make the demand for reparations a national priority and international issue. This group is called the *National Coalition of Blacks for Reparations in America [N'COBRA]*. Numerous individuals and organizations are members. The organizations include the National Conference of Black Lawyers, the Foreign Affairs Ministry of the Provisional Government of the Republic of New Afrika, the New Afrikan People's Organization, and the Black Reparations Commission. A *call* is out to all Black-led organizations to join this Coalition. The Nation of Islam has participated in the N'COBRA meetings.

The idea for N'COBRA came out of the National Conference of Black Lawyers' 1987 conference on the United States Constitution. Dr. Imari A. Obadele initiated the call for the creation of N'COBRA. Vince Godwin, representing the Foreign Affairs Ministrry of the Republic of New Afrika, served as the initial acting chairperson of N'COBRA. The National Conference of Black Lawyers and the RNA Foreign Affairs Ministry served as the initial coordinators of N'COBRA.

N'COBRA wants to involve as many people and organizations as possible in the movement for reparations. At N'COBRA's first town meeting in Washington, D.C., on 8 April 1989, State Senator Bill Owens of Massachusetts spoke. He had introduced a reparations bill in Massachusetts. On 3 June 1989 N'COBRA held a successful forum on The Religious Communities' Response to the demand for reparations. At that forum a decision was made that Atty. Chokwe Lumumba, chairperson of the New Afrikan People's Organization and Atty. Adjoa Aiyetoro would co-chair a national N'COBRA committee to plan for a national reparations conference. That was held on 8 July 1989 in Washington, D.C., and a draft reparations bill, pepared by Congressman John Conyers, was discussed in detail with members of the Congressman's staff. (Congressman Conyer's bill calls for Congressional hearings, to create formal "findings," on the nature and impact of slavery and post-slavery discrimination on Afrikan people in the United States.)

N'COBRA believes that Black people must unite and organize around the demand for reparations. By reaching out to every Black-led organization, We are accepting the challenge, so eloquently articulated by Minister Farrakhan at the African-American Summit, to unite with all our brothers and sisters to organize our people and make our just demand. We need every Black person's support. If We believe in our value and strength as a people, We will overcome any differences We may have and wage a united and righteous battle for reparations.

For more information about N'COBRA you can write: P.O. Box 62622, Washington, D.C. 20029-2622 or call (202) 635-6272.

Exhibit NAMOE

# Government Means Teamwork



**Ukali Mwendo, President, PGRNA**

The Provisional Government of the Republic of New Afrika (PG-RNA) came into existence during a period of intense social and political turmoil within the united states, and the world at large. This period, the 1960s, was characterized by widespread dissent and protest against "white" (european and american) domination of almost every aspect of the lives of African peoples. In the united states, growing numbers of progressive "Black" (New Afrikan) people had begun organizing for power – beyond the scope of the Civil Rights Movement that had already reached its height in preceding decades.

On Sunday, 31 March 1968, in the city of Detroit, a broad gathering of these progressive New Afrikans signed a bold and bracing *Declaration of Independence* – asserting the will and the reasons for breaking free from u.s. legal jurisdiction and the obligations that were forcibly placed upon us, as a people, by "paper" citizenship under u.s. law.

At that moment, the work of our Provisional Government began in earnest: to peacefully organize against our oppression under u.s. law by struggling for and exercising our right to live freely under our own system of laws on the land our ancestors worked to develop and protect. To help achieve this goal, a framework for collective decision-making was created with an array of offices and officials dedicated to carrying out the aims of the *Declaration*. This governmental platform that helped guide the early phase of the New Afrikan Independence Movement (NAIM). Over the course of more than three decades this platform evolved into the current PG-RNA, with a new (since 1984) structural arrangement of governmental offices, affirmed and recorded in our Constitution -- the *Code of Umoja*.

There is one thing, however, that hasn't changed and can't be changed: the need for dedicated officials who are willing to carry out the aims of the *New Afrikan Declaration of Independence*. This critical necessity -- dedicated New Afrikan officials -- is the heart and soul of our government. Whether elected or appointed, these committed individuals give real meaning and substance to the noble words that are enshrined in our *Declaration* and in the *Code of Umoja*. Taken together, their individual qualities, their individual skills or talents, and their individual reasoning abilities help define the collective character, values, and priorities of each PG-RNA administration. Without these officials, our government ceases to exist. Without enough dedicated officials, our government suffers. It is mandatory, then, that no PG-RNA office goes unfilled for too long.

Under the *Code of Umoja*, citizens of the Republic of New Afrika freely elect District Representatives, District Judges, the President and Vice Presidents of our Provisional Government. Additionally, the *Code of Umoja* sets forth appointed positions for National Ministers, Election Commissioners, and needed personnel [for example, a Secretary for our PCC, the People's Center Council]. Other officers are allowed for, based on special circumstances and the prevailing will of our citizens. The duties, responsibilities, and scope of these offices form the backbone of government for our people. As long as any office is vacant, our goal of complete sovereignty is further delayed and our independence Movement is further weakened.

A big challenge that each PG administration faces is finding, recruiting, and retaining RNA citizens who are not only capable of fulfilling the roles of government officers, but who also possess an unshakable faith in our people. Faith in our people is demonstrated by citizens who fulfill their oath of office with high levels of honesty, performance, and integrity. These personal characteristics speak loudly. They help define the New Afrikan "worksiyle" that will see us through to victory: independence, sovereignty, and self-determination.

Our current administration is searching for these kinds of people -- citizens with the capabilities and characteristics that will advance our Movement and strengthen our system of government. We are grateful, indeed, for those officers (from the past administration) who continue to serve our people despite the many difficulties encountered along the way. These governmental officers, these committed citizens of New Afrika, are the core members of our state-building team -- and government means teamwork!

So let the word go out that We are seeking more team members. We intend to steadily build a full roster of National Officers in keeping with the ideals and precepts expressed in our *Declaration of Independence* and our *Code of Umoja*. Citizens of the Republic of New Afrika are invited to take part in this process, and can obtain more details by writing directly to me at: **P.O. Box 3088, New Orleans, LA 70177.**

Working together, in concert with one another, our quest for independence is not only possible, it is also unstoppable and achievable.

*Ukali Mwendo, President*
*Provisional Government of the*
*Republic of New Afrika*

EXHIBIT NARM-5



TERRITORY

# New Afrikan Nation Day

NATION TIME SPRING 2003 - pg. 3



**SPECIAL TO NATION TIME:** – New Afrikan Independence Day, honoring the founding of the <u>Provisional Government, Republic of New Afrika, will</u> be celebrated with planning and work sessions at Tougaloo College (north of Jackson), Mississippi, on the weekend beginning March 28, 2003. Please plan to come to Mississippi to celebrate the 35th anniversary of the founding of the Republic and the signing of the Declaration of Independence.

Persons of African descent born in the united states were not permitted to be u.s. citizens. This was the reality traced by Chief Justice Roger Taney in the 1857 Dred Scott case when he ruled that no person of African descent, whether enslaved or free, could be a u.s. citizen unless the u.s. Constitution were changed. Moreover, the 'citizenship' alleged to be held by persons of African descent in america was in fact FORCED on us. You cannot force citizenship on anyone. Citizenship is a contract – an offer and acceptance agreement between the government offering it, and those persons who want it VOLUNTARILY.

Rejecting this forced citizenship, declaring their independence of the united states and their right to have

land of their own within the u.s. borders for our own sovereign nation, 500 New Afrikans met in Detroit, MI on March 31, 1968, signed their Declaration of Independence and enshrined the sovereignty of the Republic of New Afrika. The territory within the u.s.

---

*The celebration of New Afrikan Nation Day will begin on Friday, evening, March 28 at 6 p.m. in the Owens Health and Wellness Center at Tougaloo.*

---

borders developed by the blood of our ancestors, and in which Afrikans were long the majority population (although for a time enslaved by the u.s. conquerors) was identified as the <u>Kush District and renamed the Republic of New Afrika. That territory is the states South, Carolina, Georgia, Alabama, Mississippi and Louisiana.</u>

The celebration of New Afrikan Nation Day will begin on Friday, evening, March 28 at 6 p.m. in the Owens Health and Wellness Center at Tougaloo. Registration and a welcoming reception will take place at that time.

On Saturday, the program will

begin at 9:00 a.m. and continue until 10:00 p.m. Workshops, guest speakers and a cultural program are included in the all-day schedule of activities. The closing ceremony will be held on Sunday, March 30, from 9 a.m. to 1 p.m. Officers of the Republic will par-

ticipate in a major rally in Jackson to support Chokwe Lumumba's battle against disbarment. This rally begins at 3 pm on Sunday. We urge all to attend and join the battle to stop this callous attempt to silence another of our New Afrikan warriors – the People's Attorney, Chokwe Lumumba.

International Law supports our efforts to gain sovereignty. The *United Nations' Declaration of Human Rights* expressly supports this right in Articles 15(1) and (2) respectively:

*1. Everyone has the right to a nationality.*

*2. No one shall be arbitrarily deprived of his nationality nor denied*

*the right to change his nationality.*

The 1945 Charter of the United Nations shows that the right of persons under control of a conqueror to obtain "a full measure of self-government" and for the conquering power "to take due account of the political aspirations of the peoples concerned" are required by Chapter XI, Article 73(a) and (b).

Our ancestors became free persons – but **NOT** u.s . citizens. As free people, they could no longer be told what to do politically, and should have been given the following choices about what they wanted to do:

☐ Do you wish to voluntarily become a u.s. citizen?

☐ Do you wish to go back to Africa

☐ Do you wish to go to some other country? or

☐ Do you wish to be part of your own country established on these shores?

A very important part of the program this Nation Day is preparation for a duly-conducted plebiscite, under the auspices of the United Nations, giving our people the long-delayed, choice.

Come to Tougaloo College to celebrate the 35th Anniversary of New Afrikan Nation Day. . . . . . . . . .
*Sovereignty will be ours.*

NEW AFRIKAN POLITICAL PRISONERS AND POLITICAL PRISONERS OF WAR:
INTERNAL CONTRADICTIONS

Land, independence and self-government have been objectives sought by Black
people ever since We were kidnapped from Afrika and brought to this country as slaves.
Many ran away and established communities in the woods, mountains and swamps and
armed themselves and created bases on which they could operate and to which other
slaves might flee. Others organized rebellions aimed at freeing slaves and liberating
territory from which to build an independent state. To the Black people who were forced
to come to this land, Black nationalism was not taken lightly. Although brutally crushed,
Our ancestors continued to revolt. Although sold down the river, they continued to
escape. Independence and self-determination were what they wanted. These Blacks were,
in effect, laying bricks on a foundation that was later to become known as the Republic of
New Afrika. (1)

The process that gave rise to what became defined as the New Afrikan Nation
started on the Afrikan continent and carried over to north amerika. Primarily the New
Afrikan Nation was born as a result of its own internal motion and internal contradictions.
Afrikan tribes were combining into, were fused into, nations, prior to being transported to
amerika.

You may have had one nation comprised out of many tribes and, though each
tribe had their own distinct tribal identities and culture, they recognized their collective
identity based on their particular collective and historical development, for example, the
naming of themselves as Angolans, Nigerians, Ghanaians, etc. These are national
distinctions and national identities. Despite the fact that within their borders they have
different tribal origins and relations, their national identity and national consciousness is
that of one collective definition.

Primarily a New Afrikan is an Afrikan born in north amerika. New Afrikans hold
many different theories; some are socialist, some are capitalist, some are nationalist, some
are pan-Afrikanist, and so on. The Republic of New Afrika (RNA) is the name given to
the Black Nation in Amerika by 500 nationalist leaders at the Black Government
Conference held in Detroit, Michigan and convened by the Malcolm X Society on March
29-31, 1968. The RNA consists of millions of people with millions of ideas. (2)

Marcus Garvey once exclaimed, "Where is the Black man's government? Where
is his President, his Army, his Navy, his men of big affairs?" On March 31, 1968, the
seed of Gravy's prophetic vision came to fruition as a force of over 500 Black nationalists
met at the convention in Detroit and issued a DECLARATION OF INDEPENDENCE
for a Black nation on the north amerikan continent, named that nation the REPUBLIC OF
NEW AFRIKA, identified five states in the deep south as the subjugated National
Territory, created a basic law and a provisional government with elected officials under a
mandate to FREE THE LAND. (3)

THE PROVISIONAL GOVERNMENT TEACHES THAT ALL BLACKS,
DESCENDANTS OF SLAVES IN NORTH AMERIKKKA, ARE CITIZENS OF THE
REPUBLIC OF NEW AFRIKA BY BIRTH, FOR WE HAD BEEN SNATCHED FROM
EVERY REGION IN AFRIKA AND MOLDED BY THIS COMMON HISTORY OF
OPPRESSION AND STRUGGLE INTO A NEW AFRIKAN NATION IN THE

They have attempted to deligitimate Our righteous struggle for freedom by portraying Us as common criminals, as bandits.

"Kolonialism has been identified as a crime for over three decades. The United Nations General Assembly has consistently asserted that kolonized and dependent people have the right to use all means available, including armed struggle, to resist kolonialism. And since the General Assembly Resolution 3103 was passed in 1973, captured anti-kolonial combatants have been entitled to POW status. This protected status for people fighting kolonialism is specifically designed to assist the customary international law right to self-determination and to stop the kolonial powers from perpetrating the crime of kolonialism.

The expansion of the definition of international conflicts in the additional protocols to the Geneva Conventions to include those struggling for national liberation, also constituted recognition by the international community that the protection of anti-kolonial fighters was to be elevated to a customary norm of international law." (6)

The u.s. government, contrary to its own constitution and the laws of the international community, has continued to kill, maim and imprison those who embrace revolutionary politics. Combatants of the New Afrikan Independence Movement, when captured, are not afforded the same so-called rights or due process afforded to so-called citizens. Nor are these combatants afforded the rights or protections as mandated by the UN and Geneva Conventions. These combatants receive disproportionate sentences, receive preventive detention/no bail, are forced to be transferred back and forth to kourt by SWAT teams, elaborate and overwhelming security systems and personnel put in place designed to not only intimidate jurors, but to leave a lasting impression with the public of a dangerous kriminal.

Once these combatants are "convicted," they often face torture from the state. They are singled out solely based on their politics for assassination and placed in supermax control unit prisons where they are psychologically and physically tortured/brutalized. Locked in solitary confinement 23 and 23 1/2 hours a day, they are often subjected to sensory and perceptual deprivation and total social isolation. As a rule, the majority of these Political Prisoners of War are kept in these torture chambers known as control units for 5 to 10 years. By the end of their tour of duty, if there is an end, they will have received the state's full inventory of vicious and barbarian treatment.

"It is a violation of international law for a state to attempt to criminalize the struggle of peoples to achieve self-determination. According to the authoritative United Nations Resolution 2625 (xxv) of 1970: 'Every state has the duty to refrain from any forcible action which deprives peoples...of their right to self-determination and freedom and independence,' and resolutions 32 and 33/24 (1978) which condemn 'imprisonment and detention of people fighting kolonialism.'" (7)

Historically, the issue of PP's and POW's has been viewed one-sidedly and rigidly. The movement has tried to stick to the definition of the UN and the Geneva Convention as it defines PP's and POW's, and consequently has developed various strategies geared towards liberating such prisoners by engaging in struggle based on these definitions.

"Prisoner of War" has essentially been defined as those combatants struggling against kolonial and alien domination and racist regimes captured as prisoners of war and

3

as Namibia, occupied Palestine, etc. Today these institutions cater to and are dominated by the imperialist world powers, especially the united states. The UN in particular has become a weapon and instrument in the hands of western imperialists, in the interest of kapitalist economics and global white supremacist hegemony, in the interest of kapital and the so-called new world order.

So the question has to be asked whether or not the NAIM should solely depend upon these institutions to not only recognize our PPOW's but to help Us in liberating them? Is it tactically and strategically sound? Furthermore, the question must be asked, do undemocratic institutions have the sole authority to determine for Us or to set criteria as to who are Our Political Prisoners and Prisoners of War? Or do We, as a legitimate independence movement engaged in protracted national liberation struggle, determine for Ourselves and Our people who Our Political Prisoners of War are? I am not talking subjectively, talking about individual personal definitions etc., but about defining Our captured combatants from and by legitimate organs that are part of the NAIM. Legitimate organs that comprise the NAIM.

Granted, those brothers and sisters of the movement who were captured for being active and a part of armed formations, should not only be given priority, but supported in every way. This includes petitioning the UN and bringing the united states up on charges for violating International Law. But this should be a tactic and not the sole strategy. A tactic geared towards not only putting the u.s. on the defensive, but exposing its hypocrisy and contradictions to the international community, the same tactic that is being utilized around the right to reparations. Yet while pursuing this tactic, other strategies must be employed that take into account Our objective and national reality as a subjugated neo-kolonial nation.

This reality clearly demonstrates that We have other Political Prisoners and Prisoners of War that do not fall under the criteria or definition of international bodies. Whether one likes it or not, its a fact. There is nothing clever or divisive about the choice to confront this reality. For one, being clever is to imply that one is being deceptive. In this case one is being straight up, blunt and to the point. One position is crystal clear, there is nothing clever about it. Second, you cannot divide something that is not unified. In order to separate there must first be togetherness. At present, due to the many different factions and organs that make up the NAIM, the NAIM as of yet has not collectively, as a movement, defined who are its PP's and POW's. There have been different variations of the same theme that are a result and a reflection of organizational politics. The arguments of divisivenes, etc. are weak attempts to circumvent and obscure the contradiction. It is using evasive action to avoid confronting these contradictions objectively, non-emotionally and non-subjectively.

"Traditionally, the consensus regarding those captured by the state who belong to organized formation within the New Afrikan Independence Movement has been to accord them with either PP or POW status...

"This general consensus usually flows in accordance with the way in which the situation develops -- from the outside in, meaning that not until a combatant or activist had been captured does he/she become a POW or PP. This status is more representative of organizational politics than of any universally accepted or specifically recognized protocol." (10)

mobilizing Our people for protracted struggle. Our struggle has to be firmly grounded/rooted and based among the New Afrikan masses.

We have to ask Ourselves, what is the most effective way to support Our captured PP's and POW's and people in general. How do we build a movement by focusing on prisoners, Our captured brothers and sisters locked in these dungeons. At some point We have to make it clear to Our own, the contradiction of being tried in u.s. kkkourts, of being held in u.s. prisons. We are Our own liberators and therefore must develop strategies based on Our collective reality as an oppressed people and use these strategies to interact with Our people on every level with the objective of raising their national consciousness and bringing them into the liberation struggle, bringing them into the process to free ourselves, to seize land and state power. Those who have genuinely transformed and committed themselves to the NAIM and the liberation of Our people have to be supported and exposed to Our people. What is important is what moves Our struggle forward and to a higher state of revolutionary fervor.

RE-BUILD

SHAKA SHAKUR
For the Spear and Shield Collective - Midwest

NOTES:
(1) Historical Foundation of the NAIM, pg. 54, *Vita Wa Watu*
(2) Chokwe Lumumba, *Roots of the NAIM*, pg. 2
(3) The Founding of the Provisional Government, pg. 54, *Vita Wa Watu #9*
(4) Ibid
(5) Chokwe Lumumba, *Roots of the NAIM*
(6) *Special International Tribunal on the Violations of Human Rights of Political Prisoners and Prisoners of War; In United States Prisons and Jails*, pg. 17
(7) Ibid
(8) *World Almanac*, 1992
(9) Ibid
(10) Sanyika Shakur, *The George Jackson Phenomenon: Flowing in File*
(11) Ibid
(12) Ibid

ξ

The Need For Ideological
Consistency - Part II

> We must have a solid ideological foundation to
> guide all Our actions.  All Our actions have a
> purpose - Our actions serve a purpose, are
> subordinate to the purpose - to liberate the
> nation, establish the new society, and raise
> the New Afrikan personality.(1)

We overstand* that the ideology of a party, organization,
class, movement and thusly a people, is both implicit and explicit
in everything they do.  Consequently, ideology is too important of
an issue to leave untreated or discontinued as a central theme of
Our growing consciousness, consolidation and organization.

Interestingly enough, Our initial efforts to elucidate the
need for ideological consistency, with What's In A Name, was met
with enthusiasm from the streets to the cellblocks.  We've taken
this as a sign of need, a collective recognition by conscious
elements both within as well as on the fringes of the New Afrikan
Independence  Movement,  that  ideological  consistency  is  a
prerequisite for any collectivized movement serious about fighting
and winning.

With this overstanding, We've returned to this issue in hopes
of further illuminating the need to have "a solid ideological
foundation to guide all Our actions."  With this treatment, We'll
rely  heavily  upon  Thoughts  On  Consolidation,  Ideology  and
Organization.  From Notes from a New Afrikan P.O.W. Journal, book
# seven.

### The Need For Ideological
### Consistency - Part II

> We must have a solid ideological foundation to
> guide all Our actions.  All Our actions have a
> purpose - Our actions <u>serve</u> a purpose, are
> subordinate to the purpose - to liberate the
> nation, establish the new society, and raise
> the New Afrikan personality.(1)

We overstand* that the ideology of a party, organization,

class, movement and thusly a people, is both implicit and explicit

in everything they do.  Consequently, ideology is too important of

an issue to leave untreated or discontinued as a central theme of

Our growing consciousness, consolidation and organization.

Interestingly enough, Our initial efforts to elucidate the

need for ideological consistency, with <u>What's In A Name</u>, was met

with enthusiasm from the streets to the cellblocks.  We've taken

this as a sign of need, a collective recognition by conscious

elements both within as well as on the fringes of the New Afrikan

Independence  Movement,  that  ideological  consistency  is  a

prerequisite for any collectivized movement serious about fighting

and winning.


With this overstanding, We've returned to this issue in hopes

of further illuminating the need to have "a solid ideological

foundation to guide all Our actions."  With this treatment, We'll

rely  heavily  upon  <u>Thoughts  On  Consolidation,  Ideology  and</u>

<u>Organization.</u>  From <u>Notes from a New Afrikan P.O.W. Journal, book</u>

<u># seven.</u>

The consciousness required to overstand the need _for_ and the function _of_, ideology obviously predates any call We may make for consistency in promoting the ideology.  Therefore, We'll use both as a point of contact and departure a brief definition of ideology as found in Ivan Frolov's _Dictionary of Philosophy_ (1984):

> Ideology:  A  system  of  political,  legal, ethical,  aesthetical,  religious  and philosophical views, _and ideas._  Ideology is part  of  the  superstructure  and  as  such ultimately reflects economic relations.  In a society with antagonistic classes, ideological struggle corresponds to the class struggle. Ideology may be scientific or unscientific, a true  or  false  reflection  of  reality.  The interests of reactionary classes nurture a false ideology, the interests of progressive, revolutionary classes help shape a scientific ideology...  The development of ideology is ultimately determined by the economy, but ideology  possesses  a  certain  relative independence.  This  is  expressed,  in particular, in the impossibility of directly explaining  the  content  of  ideology  by economics and also in a certain unevenness in economic and ideological development. (1)

Because  ideology  encompasses  "...political, legal, ethical, aesthetical, religious and philosophical views and ideas"  of how We perceive the world and the way it works, _What's In A Name_, did not go far enough with an explanation of the overall power of a scientific ideology.  And while it dealt with nationality, an overstanding reached from within the context of a scientific ideological formulation, it did so with _form_ without subsequently detailing _function._  So this is what We want to do here.

Once We overstand what ideology is, We necessarily must know its function.  That is, the action which does (or can) develop as a consequence of its existence.  From the above definition We

overstand that this action can take on either revolutionary or reactionary modes of existence, depending upon its relationship to the means of production.

We overstand, for example, that the ideological formulation of the bourgeoisie, the capitalist-imperialists, is fervently reactionary - both implicitly and explicitly in everything it does - because this system of beliefs is "part of the superstructure and as such ultimately reflects economic relations". Economic relations _is_ political relations, _is_ legal, ethical, aesthetical, religious and philosophical - because "in a society with antagonistic classes, ideological struggle corresponds to the class struggle." Vibe on that and overstand why eurocentricity is a _must_ in the U.S. empire and the world, even though euro-amerikans comprise less than 14% of the worlds population.

> All ideologies arise form the historical experience of a GIVEN people which means ideologies are indigenous, and not importable. And, any given ideology can be revolutionary or reactionary. The ideology explains causes and puts forth ways and means. The development of an ideological framework demands research, study, analysis. In seeking ideological consolidation for organization, the movement and the entire nation, We seek a particular, a specific order for Ourselves, as We struggle for independence and, after independence, as We further consolidate and develop the new socialist society. (3)

Ideology, then, _is_ a result of "research study and analysis" of the sum total of a peoples social developmental experience, given shape ("framework") by theory, inconjunction with the desires of the given people. Moreover, thru research, study and analysis (necessarily dialectical and materialist) the given people create

an indigenous/scientific ideological formulation capable of facilitating their needs. Because Our needs relate to, and are governed by, Our struggle to regain Our independence, and establish the socialist Republic of New Afrika, We thusly have an altogether different take on the world and how it works in relations to us as a part of it, from that of the bourgeoisie. Not consequently so, but necessarily so.

Now that We've shed some light on what ideology is, let us now vibe on its function, or what it does:

> 1) The ideology gives us Our beliefs about the nature of the individual, about the relationships between individuals, about the relations between individuals and nature, and the type of society We want to build. These beliefs are part of the total "mind behind the gun".
>
> 2) The ideology has principles which are fundamental aids in helping us to create the organizational and institutional structures that We build while We fight, to transfer the support of the people from the enemy state and [ideology] to Our Own state.
>
> 3) The ideology establishes boundaries, it says what's possible and desirable, and what's not possible and what's undesirable. It establishes identity, purpose and direction. It unites, establishes common attitudes and forms of behavior. (4)

The pervasiveness of ideology is beginning to surface. Actually, We've been existing continually within the ideological "framework" of another's way. We've been consumed by the "political, legal, ethical, aesthetical, religious and philosophical views and ideas" of the oppressor. It is the ideological captivity Our people allude to when they refer to the chains being taken off Our bodies and put on Our minds. In Our

way, We are expressing Our comprehension of ideological imperialism. The fundamental strength of ideology, revolutionary or reactionary, can be seen by Our continual subjugation without physical chains.

Not to say, or imply, that an indigenous ideology has never existed among New Afrikan people, because We can clearly point to some example of this. However, We've not utilized Our own social develop to erect, consolidate and pass on an indigenous New Afrikan revolutionary communist ideology - from one generation to the next. And this is what We must not fail to do now. This is the prerequisite for the successful struggle for land, independence and socialism.

The New Afrikan revolutionary communist ideology takes into account the social development of Our New Afrikan Nations. Of Our continental (Afrikan) roots running deep in the motherland, and Our national ("tribal") roots having been fused here generating Our continuance. It sets for us, as it did for Denmark Vesey, a burning need to regain Our independence thru the necessarily violent separation of Our social and productive forces from U.S. imperialism. Moreover it:

> Explains the causes of the present situation,
> and points out the ways and means of changing
> the present and creating a specific future
> situation. (5)

Similarly:

> Our ideology contains principles regarding the
> spirituality, humanity and dignity of Our
> people; a belief in the community as a family,
> and a belief that the community is more
> important than the individual.    These are
> principles and beliefs that We are struggling
> to make live, and in the present situation We
> are confronted by a complex set of opposing
> beliefs and principles which are based,
> ultimately, upon a philosophy of the world
> which is antagonistic to Ours. (6)

Again, We feel it is premature to call for ideological
consistency, if/when the collective overstanding of ideology is
incomplete, or worse still, non-existent.  We hope that some more
light has been shed here.  The struggle is for Land, Independence
and Socialism!!

Re-Build!
Sanyika Shakur
Spear And Shield Collective

Exhibit NAIM-F

Exhibit F

... practice ... the concrete co... ...tion.

Q: What is a "New Afrikan" and, can a white person become a "New Afrikan"?
A: The Spear and Shield Collective recognizes "New Afrikan" as the term that specifies our national identity, or, our nationality.

We believe that our national identity has two elements: 1) a biological element ("original identity") and, 2) a sociological element ("actual identity"), and that the sociological element is the primary determinant of our national identity, or, of our nationality. (See the passage from Amilcar Cabral, on *Identity*, in this issue, p. 23)

For these reasons, and others, We also believe that "white" people, or, people who have other national origins, can become New Afrikans — can embrace New Afrikan national identity — and their New Afrikan nationality can be formally recognized through the process of naturalization.

In the propaganda of the NAIM, We say that all people of Afrikan descent in the U.S. are "New Afrikans," but in the real world We know this ain't the case. Being and becoming a New Afrikan is a matter of choice — a matter of consciousness, practice, and political allegiance. This is why We distinguish "Conscious New Afrikans" from those with no allegiance to the NAIM, and who don't actively participate in its activities.

Moreover, from our perspective, We believe that a Conscious New Afrikan should: 1) be a "revolutionary nationalist," i.e., have a socialist orientation; 2) be anti-racist; 3) be anti-homophobic, and, 4) be anti-patriarchal.

*   *   *

SSP  3420  W.  63rd  Street  Chicago  IL  60629;  7737378679;  crsn@aol.com

Exhibit NAIM~G

# New Afrikan Liberation Movement

**New Afrikan Maoist Party**                          **New Afrikan Ujamaa**
**New Afrikan Brigade**                                **New Afrikan Collective**

Salamu Ndugu:-

If you're receiving this it means that you're on Our mailing list. Here We wish to update you on Our work.

We haven't communicated with you or put out any recent publications because We're preparing to improve the quality of Our work. We intend to promote the business and financial development of those of you who continue on with Us as either associate or regular members of Our movement – associate members being supporters and regular members being active in either Our Party, the Brigade or the Ujamaa.

We also intend to put out more issues of the *Party Bulletin*, the theoretical organ of Our Party; and to put out a new publication called the *New Afrikan Times*, which will serve as a general information source and agitational tool covering social, cultural and financial issues from a New Afrikan perspective – similar to the Final Call or Amsterdam News, but from the perspective of the international proletariat.

So, if you haven't heard form Us lately, this is the reason. We are also dealing with some legal issues regarding incarcerated members of Our movement in New York (see enclosed article). Some of you have written in inquiring about the Party Congress. If you were invited to participate, then you still are. This is another task that has been delayed due to a shift in conditions. We look forward to addressing the issues brought forth in the initial Congress documents in the near future.

We're not going to forget about you.

Umoja ni Lazima, Umoja Sasa

In Solidarity,

Eusi Uwendo, Executive Assistant
NAMP

PO Box 40799 • San Francisco, CA • 94140
namp@nym.hush.com
http://www.NewAfrikanMaoists.org

# ON SEXIST OPPRESSION

**Sanovia Muhammad,**
**Coordinator of the New Afrikan Women's Taskforce,**
**New Afrikan People's Organization**

As conscious New Afrikan women, it is incumbent upon us to challenge sexist oppression, wherever, we find it!!! However, We call on all conscious New Afrikans to take this challenge, recognizing that for all of us to be free and independent, we all must be involved in this struggle.

Sexism runs rampant in religions, institutions and social structures and we must fight against it everywhere. However, at this writing i am most concerned about how we support and perpetuate this oppression in writings. Male centered language, conceptually promotes women's oppression. This language often talks about freedom like it will benefit men only, and liberation as man's domain. Take for example the following:

*"To build a new Society that is better than what We now know and as perfect as **Man** can make it; To create conditions in which freedom of religion abounds and **man's** pursuit of God and/or destiny, place, and purpose of **man** in the Universe will be without hindrance". (The New Afrikan Declaration of Independence).*

In December, i was in dialogue with young sisters at the University of Chicago at Urbana. They are strong Black women, struggling for their identity, and challenging the sexism that continues to perpetuate itself on college campuses. They spoke about the condescending ways they are treated, especially when they espouse changes in the status quo. Coming from the perspective of a revolutionary nationalist, encouraging them to be a part of an organization and a movement that believes and promotes the equality and development of women, and an independent New Afrikan Nation i have to be able to show them concretely, not in a line on a piece of paper, the implementation of this theory. So if i stand with them and discuss the Declaration of Independence, in the context of a society promoting egalitarian principles, and as we read it, the emphasis is on "mankind", "man's pursuit of", "man's genius", etc., there is a glaring contradiction that must be dealt with. We understand, historically, the era that this document was written in. We also understand that as an archival document, we cannot change it. However, as striving

revolutionaries and as examples to our communities, we are obligated to oppose the use of this malecentered language in the movement For us to accept the analysis that this language is inclusive of the entire Nation is preposterous. If it is inclusive then let us refer to "womankind" and accept that it includes men. No! our language must refer to our people collectively. This is not to assume that there will not be times where it is necessary to be male centered and female centered. However, whenever we are talking about the survival and liberation of our New Afrikan Nation, we are definitely talking about the participation of its women and men.

For those of us who use this document and others like it, we must acknowledge the sexism, and reflect in our discussions, our progress on the issue. We also must reflect that this progress/development comes out of the historical contributions women have made to the liberation of the Black Nation and our struggle to be free of exploitation. For this reason and others, how we define, explain and promote our movement is crucial.

This is one example, but there are many. Most of the political writings, by men, where we learn and develop political theory, are sexist, intentional or not. Understanding that it arises out of an ingrained system of white male supremacy, the fact that some of our best minds perpetuate it, should indicate the seriousness of our task. We cannot continue into the year 2000 supporting, or promoting backward ideas and practices, written, verbal or otherwise .

Our movement,where revolutionary consciousness is highest and where the concept of creating a better world and a better people is a goal, has to take the leadership in addressing and correcting this issue . In our struggle against oppression, in all its forms, the struggle against the oppression of women, one half of our Nation, must be a priority on our agenda.

We must all be committed to the full participation of women in the struggle for National Liberation, in word and deed.

# Malcolm X Grassroots Movement
## P.O. Box 380058
## Brooklyn, NY 11238
## 718-230-1911

Dear Brother *Abdul*,

Free The Land!!

Thank you for taking the time to write us. We would like to welcome you to the growing family of friends, supporters and members of the Malcolm X Grassroots Movement. We hope that this is only the beginning of a productive relationship and we encourage you to continue to write and support us.

We are a New Afrikan (black) community based activist organization. Our work is focused around six principles of unity: 1.) Freedom for all Political Prisoners of & Prisoners of War, 2.) the right to New Afrikan self-determination, 3.) an end to sexist oppression, 4.) an end to racist genocide, 5.) reparations for all survivors of the Afrikan holocaust (middle passage & slavery), 6.) and the struggle for basic human rights around the world. We hope that you will join us as we carry on the legacy of struggle that Afrikan peoples have waged against european oppression and subjugation (white supremacy). This movement was born the moment we were captured on the shores of West Afrika and has survived the revolutionary spirit of the 1960's and '70's. The movement continues today as we engage the most complex and challenging institutions we have ever faced.

The Malcolm X Grassroots Movement meets these challenges head on as we look toward the next millennium and beyond, we struggle to shape the character of a unified and powerful New Afrikan Nation. We will add you to the mailing list of the Brooklyn Chapter to keep you connected and we invite you to attend our programs, rallies, etc.. Any contributions that you can make to support our day to day expenses would be greatly appreciated, checks can be made out to: Malcolm X Grassroots Movement. We have nine other regional chapters throughout north america, if there is a chapter in your area, please contact them to become more active in the struggle to free our people.

Free The Land!!!

# Exhibit NAIM-H

## NEW AFRIKAN DECLARATION OF INDEPENDENCE

WE, Black People in America, in consequence of arriving at a knowledge of ourselves as a people with dignity, long deprived of that knowledge; as a consequence of revolting with every decimal of our collective and individual beings against the oppression that for three hundred years has destroyed and broken and warped the bodies and minds and spirits of our people in America, in consequence of our raging desire to be free of this oppression, to destroy this oppression wherever it assaults humankind in the world, and in consequence of inextinguishable determination to go a different way, to build a new and better world, do hereby declare ourselves forever free and independent of the jurisdiction of the United State of America and the obligations which that country's unilateral decision to make our ancestors and ourselves paper-citizens placed on us.

We claim no rights from the United States of America other than those rights belonging to human beings anywhere in the world, and these include the right to damages, reparations, due us from the grievous injuries sustained by our ancestors and ourselves by reason of United States lawlessness.

Ours is a revolution against oppression—our own oppression and that of all people in the world. And it is a revolution for a better life, a better station for all, a surer harmony with the forces of life in the universe. We therefore see these aims as the aims of our revolution:

- To free black people in America from oppression;
- To support and wage the world revolution until all people everywhere are so free;
- To build a new Society that is better than what We now know and as perfect as We can make it;
- To assure all people in the New Society maximum opportunity and equal access to that maximum;
- To promote industriousness, responsibility, scholarship, and service;
- To create conditions in which freedom of religion abounds and the pursuit of God and/or destiny, place and purpose of humankind in the Universe will be without hindrance;
- To build a Black independent nation where no sect or religious creed subverts or impedes the building of the New Society, the New State Government, or achievement of the Aims of the Revolution as set forth in this Declaration;
- To end exploitation of human beings by each other or the environment;
- To assure equality of rights for the sexes;
- To end color and class discrimination, while not abolishing salubrious diversity, and to promote self-respect and mutual understanding among all people in the society;
- To protect and promote the personal dignity and integrity of the individual, and his or her natural rights;
- To place the major means of production and trade in the trust of the state to assure the benefits of this earth and our genius and labor to society and all its members, and
- To encourage and reward the individual for hard work and initiative and insight and devotion to the Revolution.

In mutual trust and great expectation, We the undersigned, for ourselves and for those who look to us but are unable personally to affix their signatures hereto, do join in this solemn Declaration of Independence, and to support this Declaration and to assure the success of the Revolution, We pledge without reservation ourselves, our talents, and all our worldly goods.

Exhibit NAIM-H

## NEW AFRIKAN CREED

*1.* i believe in the spirituality, humanity and genius of Black people, and in our new pursuit of these values.

*2.* i believe in the family and community, and in the community as a family, and i will work to make this concept live.

*3.* i believe in the community as more important than the individual.

*4.* i believe in constant struggle for freedom, to end oppression and build a better world. i believe in collective struggle; in fashioning victory in concert with my brothers and sisters.

*5.* i believe that the fundamental reason our oppression continues is that We, as a people, lack the power to control our lives.

*6.* i believe that the fundamental way to gain that power, and end oppression, is to build a sovereign black nation.

*7.* i believe that all the land in America, upon which We have lived for a long time, which we have worked and built upon, and which We have fought to stay on, is land that belongs to us as a people.

*8.* i believe in the Malcolm X Doctrine: that We must organize upon this land, and hold a plebiscite, to tell the world by a vote that We are free and our land independent, and that, after the vote, We must stand ready to defend ourselves, establishing the nation beyond contradiction.

*9.* Therefore, i pledge to struggle without cease, until We have won sovereignty. i pledge to struggle without fail until We have built a better condition than the world has yet known.

*10.* i will give my life, if that is necessary. i will give my time, my mind, my strength and my wealth because this I S necessary.

*11.* i will follow my chosen leaders and help them.

*12.* i will love my brothers and sisters as myself.

*13.* i will steal nothing from a brother or sister, cheat no brother or sister, misuse no brother or sister, inform on no brother or sister, and spread no gossip.

*14.* i will keep myself clean in body, dress and speech, knowing that i am a light set on a hill, a true representative of what We are building.

*15.* i will be patient and uplifting with the deaf, dumb and blind, and i will seek by word and deed to heal the black family, to bring into the Movement and into the Community mothers and fathers, brothers and sisters left by the wayside.

Now, freely and of my own will, i pledge this Creed, for the sake of freedom for my people and a better world, on pain of disgrace and banishment if i prove false. For, i am no longer deaf, dumb or blind. i am, by inspiration of the ancestors and grace of the Creator...a New Afrikan.

2005

Exhibit NAIM-I

# TO ACTIVISTS: A CRITICAL PERSPECTIVE

*By Abdul Olugbala Shakur*

My colonial name is James Harvey, but I am known as Abdul Olugbala Shakur. I am a New Afrikan legal combatant, a revolutionary political prisoner of war in the service of the New Afrikan Independence Movement. I came to prison at the age of 18 for participating in an armed ambush of a group of white male sailors in retaliation for the rape of a young Sista from our community. I am now 43 years old and have been in isolation (solitary confinement) since 1983, and the last 17 of those years in Pelican Bay State Prison.

I was asked to write a statement for this conference concerning the control unit prisons and the security housing units (SHU). From a revolutionary perspective, I have seriously contemplated my contribution to this most important conference. I asked myself, what can I possibly say about the control unit prison/SHU that has not been already said or written? Instead, I would like to take this opportunity to address an issue equally important and key to our success as a movement.

Activists (collectively, a movement) have yet to reach a level of political, psychological, and emotional maturity that would accept criticism from politically conscious prisoners. Instead of engaging in constructive dialogue, activists become emotional, subjective and reactionary and then we are ostracized for being professional revolutionaries, but our criticisms are rooted in a concrete analysis of the concrete conditions.

People, there are a number of critical, strategic and tactical errors being made by the prisoner rights movement and I would like to use this opportunity to expand upon a few of them. My criticism in these specific areas has fallen on deaf ears, but they are too important for me to just drop. My first issue of critical analysis is the lack of New Afrikan involvement within the movement. This absence is evident in every state. In California where the largest prison population in the country resides, New Afrikan activists make up only about 2 percent of the movement. I have been critical of this absence since 1994, but to no avail. The activists don't have a clue to the significance of this issue, and their half-hearted attempts at reaching out to the New Afrikan Community are indicative of their cluelessness.

Here you have a movement 98 percent white liberals and leftists attempting to be a voice for the New Afrikan community. If I were a government official, I would pay this movement no mind. The fact that activists in California lack such a significant representation of New Afrikan people is a clear sign to any politician or lawmaker that this movement is clearly disconnected from the New Afrikan communities.

The movement can/will not achieve its major objectives without the New Afrikan community support and participation. My issue is the movement's failure to develop a specific plan designed to recruit more New Afrikan people, and this critical observation is not only applicable to the California movement.



By Dominic Lucero

The government understands that the vast majority of those activists and volunteers who make up the prisoner rights movement, don't live in the gang, crime and violence-infested communities and their voices don't represent those who do live in these communities. This takes away from the movement's credibility. Unfortunately, many within the prisoner rights movement are not capable of grasping the significance of this observation. But most important, the primary objectives of the movement such as: 1) Shutting down all control unit prisons; 2) The abolition of the Prison Industrial Complex; 3) Challenging the California Corrections Peace Officers Association (CCPOA) and; 4) Establishing social and alternative programs, can/will not be achieved without the New Afrikan community's involvement.

So I ask, are you serious about achieving the above objectives? If so, you must be able to comprehend that the present strategy used in the prisoner rights movement, for the most part, is incorrect because it lacks a specific method designed to get the New Afrikan community involved.

How to get the New Afrikan community involved? I recently explained this to Kate Berrigan of (California) Critical Resistance. I explained that you can't speak to the New Afrikan people the same way you would speak to white activists and volunteers. I told her gang violence and murders are on a pace to shatter last year's gang violence and murders in the city of Oakland. You can't go to these communities speaking about prison abolition or shutting down control unit prisons. This language is not compatible to the social realities they have to confront on a daily basis.

Many of our people live in gang-infested communities and many of them have been affected by gang violence—directly or indirectly. The last thing they want to hear about is the abolition of prisons. Another relevant fact, 95 percent of New Afrikans in prison for violent crimes were perpetrated on fellow New Afrikans.

The point I am making is that when activists come together to develop strategies and tactics, you must keep in mind, strategy and tactics, and must be flexible enough to address the unique distinctions of each target audience or community.

A Few years back, a New Afrikan community activist asked me: "Why should the community support the Brothas in prison, especially when most of them will return back to the community and engage in gang and criminal activities?" Unfortunately, the Sista was on point. Again, this is a significant observation. What she expressed to me was not an aberrant feeling. Her thoughts were a reflection of the community.

You can't transform or rehabilitate a gangster mentality with a GED or some college program, or even a vocational skill. All you have is a gang member with a GED, college degree or vocational skill. Ninety-five percent of all gang members' mental transformation has come as a result of politically conscious prisoners or community activists. I am not dismissing the significance of a formal education or a job skill. What I am saying is that these things alone will not eradicate the gang or criminal mentality. It is up to us as politically conscious prisoners to transform the

writing, "For most of one thousand three hundred and seven days, Mr. Padilla was tortured by the United States government without cause or justification. Mr. Padilla's treatment at the hands of the United States government is shocking to even the most hardened conscience, and such outrageous conduct on the part of the government divests it of jurisdiction, under the due process clause of the Fifth Amendment, to prosecute Mr. Padilla in the instant matter."

The U.S. government is accused (with convincing details) of the systematic torture of one of its own citizens. America, where is your outrage? ★

*Edited from web article: http://www.wsws.org/articles/2006/nov2006/nyt-n03.shtml from the World Socialist Web Site.*

# ACTIVISM: MOVING FORWARD

## TO THE CONFERENCE ON CONTROL UNITS: GET PRISONERS ON BOARD

My name is Russell "Maroon" Shoats(z) and I'm a New Afrikan political prisoner of war.

For over 34 years I've been locked up in so many different prisons and jails it would be too depressing to detail. Moreover, for over 25 years, the people who operate these places have done their best to destroy me through lockdowns in control units. To give you an idea of what that's been like, just keep up with the news surrounding this country's treatment of its prisoners at Guantanamo Bay, or recall Abu Ghraib. Hard to believe, huh? Well, it's true, and that's why we can defeat this practice.

With the exception of the forced closure of the former Women's Control Unit at Lexington, Kentucky and the questionable changes made in the Ohio system, most other efforts to close control units have failed.

In the last three decades, they were forced to let me out of control units for brief periods on three occasions: I faked being crazy and was medicated and transferred to a mental hospital, from which I escaped. I organized a year-long rolling hunger strike that was strongly supported by activists

in the streets, causing them to kick a dozen of us out of a control unit in Pittsburgh. Finally, when thousands of fellow prisoners burnt down another Pennsylvania prison in 1989, their actions caused our jailors to exile 1200 of its prisoners to other states, and I was banished to the federal system for implication in that rebellion (falsely).

Yet, everywhere I am sent, control units are used and so I've spent over 25 years in them - and counting. I was returned to Pennsylvania in 1991, where I've been held in its newer control units, since.

Notwithstanding all of that, I've come to learn that there's really only one surefire way to defeat the use of control units: sunlight! It's simply because the clowns that operate them are like vampires. They only respect and fear exposure to their dirty deeds. The more exposure, the more they run. Ain't that what stopped them at Abu Ghraib? And it has them on the ropes at Guantanamo. It's not the courts, not a bunch of useless moral pleas, or periodic demonstrations.



Russell "Maroon" Shoats(z) by Rashid

RASHID 7-27-06

our toughest job. Let's face it: we lost the ideological struggle and allowed this generation to become captives to the glamorization of gangsterism, with limited exceptions. So, these gangstas are not conditioned to do anything that requires them to work or sacrifice for goals that don't entail them making money.

Therefore, we must require them to help by first bringing on board their loved ones—before we'll lend a hand. Otherwise, they will pimp our efforts to death! (smile)

How? Simple: Set up an Emergency Response Network (ERN), anchored by our few outside activists, that requires any control unit prisoner who needs to activate it to do it through a loved one on the streets. And don't let any prisoner tell you they cannot find anyone in the streets who will help them, since they can always figure a way to do that when they want to get their hustle or jailhouse pimp games on.

Such an initiative will guarantee a huge response from inside; seeing as how all of the control units thrive on abusing and torturing their prisoners.

Therefore, by demanding that prisoners activate our ERN through their outside loved ones such a mechanism will assure us of eventually building up a mass-based effort, one that will be able to fuel and sustain a protracted struggle.

At all costs, we must guard against falling victim to a bunch of prisoners' pleas that will cause us to try to shoulder the ERN work without their loved ones. All prisoner letters must be sent back informing them how to activate the network. Anything short of that will doom our efforts. ★

---

**...there's really only one surefire way to defeat the use of control units: sunlight! It's simply because the clowns that operate them are like vampires. They only respect and fear exposure to their dirty deeds.**

---

We have to organize a protracted campaign centered on exposing the torture that's practiced in control units from coast to coast. We should use demonstrations, the courts, etc. – but only in support of our main thrust.

To be successful, however, we must enlist and depend on the control unit prisoners to bring their loved ones into the struggle. Otherwise, we will never muster enough energy to turn up the heat and keep the pot boiling, like in the past.

Getting most prisoners on board will be

*This piece was edited for space.*

gangster/criminal mentality. Even Comrade George Jackson, W. L. Nolen, William Christmas, Tony Gibson, Howard Tole, James McClain, Jeffrey Khatari Gaulden (just to name a few) understood this in their time. Well, things haven't changed.

People, I try to avoid engaging in regurgitated rhetoric or beating folks over the head with the same story told. I am a realist and that to me means being true to oneself as a revolutionary. I don't often say what people want to hear, but what I have to say is based on a concrete analysis of the conditions. I claim no perfection, but I am committed to the revolution and I will never place myself before or above the oppressed, and I knew when I joined the revolution it would be a total sacrifice. I have no illusion about my situation. I understand that I will never step outside of these gates again. I understood this when I pulled the trigger in the service of our righteous cause and a violent death is only inevitable. But, as a realist, I am at peace with this reality.

People, the theme of my statement is four-fold:

1. The prisoner rights movement needs to develop a specific plan designed to get more New Afrikan people and communities involved.

2. Identify your weaknesses and strengths and act accordingly.

3. Help us to develop a working relationship with the New Afrikan community which would allow us the opportunity to assist our communities in order to resolve the gang problem.

4. Help us in our endeavors to transform the New Afrikan criminal and gang mentality.

Comrade Anthony [Rayson] is also in possession of a *Peace Talk Mission Statement and Petition* that I would also like to share with you. This is a very important issue. At present, the California prison system is engulfed by a major race war between New Afrikan prisoners vs. Mexican and white prisoners. New Afrikan prisoners have been the targets in over 300 race riots last year (2005). In every one of these riots, New Afrikan prisoners were out-numbered 3 to 1 and sometimes 5 to1.

But my major concern is, since 2001, this war has spilled over into the streets. In Southern California, just three days ago (7/1/06), a young New Afrikan gang member allegedly jumped out of a car and walked up to three alleged Mexican gang members and shot them all dead. One of these individuals was only 14 years old. This was supposed to be in retaliation for the shooting death of two alleged Crip members by alleged Mexican gang members.

We need your support to end this war. The CDCR has only interfered with this process. ★

*This piece was edited for space.*

# STILL STRUGGLES AHEAD - VINDICATION FOR THE ANGOLA 3

*By Nick Trenicosta and Scott Fleming*

With great joy, we can announce that we have just received an opinion from Commissioner Rachel Morgan of the 19th Judicial District Court in Baton Rouge recommending that Herman Wallace's 1974 murder conviction be reversed. The opinion is the result of an evidentiary hearing held inside the Louisiana State Penitentiary on Sept. 19, 2006 and gives us new hope that Herman, who is 65 years old and has now been in solitary confinement for 34 years, may soon win his freedom. There are, however, still struggles ahead.

## Herman, who is 65 years old and has now been in solitary confinement for 34 years, may soon win his freedom.

The commissioner found that the prosecution violated Herman's due process rights by hiding from the jury and defense lawyers the fact that it had provided prison informant Hezekiah Brown, their key witness, with the promise of a pardon from a life sentence as well as a carton of cigarettes per week and a private room with a television on prison grounds. Under the law, this constitutional violation requires that Herman's conviction for the 1972 murder of a correctional officer be overturned. This case, like so many others, involves an incompetent and biased investigation focusing on innocent men and prosecutors who lied and cheated to win convictions.

We are still several steps away from this decision resulting in Herman's release. The commissioner's recommended ruling will now be presented to the district judge, who has the power to adopt it as is (which routinely happens), amend it, or order further hearings. We are hopeful, given the strength of Herman's case and the reasoning of the opinion, that the court will adopt the commissioner's recommendation as it is written.

If the court does overturn the conviction, it is likely that the Baton Rouge district attorney's office will appeal that decision to the Louisiana Court of Appeal and Supreme Court, a process that could take as long as two years. It is also possible that the state could seek to retry Herman, but we would vigorously challenge a retrial at this late stage as a violation of Herman's constitutional rights. Moreover, considering the weakness of the state's evidence, it is difficult to envision a retrial resulting in any verdict other than acquittal.

We spoke at length with Herman and his codefendant Albert Woodfox today. They are both overjoyed. Herman was able to personally notify several of his family members and friends, and he asked us to thank all of the dozens, if not hundreds, of people who have contributed to this cause over the years. Albert is hopeful that success in Herman's case will help him, as he is just beginning the process of litigating a federal habeas corpus petition.

We still have a long way to go before Herman and Albert are freed. We will keep everyone informed of developments in the case. In the meantime, check out this new music video dedicated to the Angola 3 case, produced by Dave Stewart of Eurythmics (http://www.youtube.com/watch?v=YByERaSXiGA), and the AP article on the new decision (http://seattlepi.nwsource.com/national/1110AP_Black_Panther_Case.html). ★

*Nick Trenticosta and Scott Fleming were attorneys for Herman Wallace and Albert Woodfox. They can be reached at: scott@prisonactivist.org*



# APRIL 1ST — COMBAT SLAVERY!

The plan for April 1st is to hold a march to and rally at the Liberty Bell, in Pennsylvania, to call for amending the 13th Amendment—specifically to strike the clause that continues the status of "slave" for those convicted of a crime. We feel that if this issue can be put on the political agenda for the 2008 elections it has a chance to gain momentum. It would be very difficult for any politician to openly make a stand for the continuation of slavery should this become a watershed issue.

We plan to use April 1st as the kickoff for a protracted national campaign. We see this as the achilles heel of the system, and we intend to hang on with pit bull tenacity. Basically, it exposes the true nature of the state as a dictatorship of the wealthy class and not in any way a "government of the people, by the people and for the people."

We see that the so-called criminal justice system is a continuation of the slave plantation system and the Indian reservation system. Of all the ethnic groups, Indians are most disproportionately represented in the system followed by the Blacks. People of color make up the vast majority of prisoners.

It goes beyond racism, and the exploitation of prisoners for cheap labor, it is fundamentally a genocidal strategy to destroy the families of our people and keep them from procreating. This strategy has reached epic proportions in the past few decades and needs to be challenged and exposed.

The civil rights movement fell short, and no where is this more exposed than by the enslavement of more than two million people and the denial of the right to vote for millions more. We believe it is time to reawaken the movement for civil rights, but this time with more teeth. We are targeting the main pillar of the state, the so-called criminal justice system and exposing it for what it is slavery and genocide!

Let those who wish to defend the status quo defend what it really is!

Who we are is an alliance of prison-based organizations:

**The Red Heart Warrior Society (RHWS)** led by Chief Tom "Big Warrior" Watts, (former White Panther, retired Exec. Director Children's Rights of PA), Sub-Chief Dale "White Panther," (retired steelworker, Grand Master Martial Artist), Medicine Chief Iron Thunderhorse, (political prisoner, Polunsky Unit, Livingston, TX), Dir. of Human Rights Daren White Eagle, (political prisoner), Steilacoom, WA.

**The Black Brigade** led by Commander Nathaniel Lee (lumpen turned revolutionary in prison), SCI Graterford, co-founder Samuel "Angel" Coley, (former Black Panther, political prisoner, died in prison 2005).

**The New Afrikan Black Panther Party-Prison Chapter (NABPP-PC)** led by Chairman Shaka S. Zulu (lumpen turned revolutionary in prison), Trenton State Prison, NJ, Minister of Defense Kevin "Rashid" Johnson, (lumpen turned revolutionary in prison), Red Onion State Prison, Pound VA, co-founder Minister of Human Rights Hasan Shakur, (lumpen turned revolutionary in prison, executed by the state, Polunsky Unit, TX, August, 2006).

**The White Panther Organization** (WPO) led by National Spokesman Billy "Spider" Johnson (lumpen turned revolutionary in prison), Corrections Corp. of America, Whiteville, TN.

We need help on the ground in Philadephia, to obtain necessary permits, a hall near the Liberty Bell to meet before and after at, and to get the word out to those who might want to take part. We also need outside organizations to take up this campaign in an ongoing way. ★

*Tom Big Warrior (610) 437-2971*
*tomw@iwon.com*

# LESLIE'S EDITORIAL COMMENTS

I just realized that *Prison Focus* is in its 10th year of publication. Time flies. So many words, much passion, some conflict and a couple of errors, and here we are. I have not had the opportunity to look back on the 27 magazines we put out as *Prison Focus*, but I hope to do that before we get going on the next one. In marking this ten-year anniversary, I thought it would be appropriate to ask our readers to send in their comments on how to improve this product. I'd also like to ask you to send in any *Prison Focus* stories or a memory of a favorite piece you read.

Over these years, we've endeavored to represent prisoners' voices, what's been on peoples' minds – whether we agreed personally or as an organization, in what was said. Though we choose and edit the submissions we receive, we keep in mind our audience. We try to bring our readers news, resources, and words that inspire, inform and sometimes entertain. As editors of California Prison Focus's magazine, we are accountable to the organization as a whole and do our best to highlight its work as well as promote its mission.

We continue to do the best we can given our constraints. Please help us improve our work by sending your thoughts on content, structure and style to Leslie and Ed this year. Thanks much! ★

*—Leslie DiBenedetto*

# SUPREME COURT STRUCK DOWN OLD CA LAW ON ENHANCEMENTS

On January 22 the highest court in the land ruled in *Cunningham v. California*, (Docket # 05-6551), that California's thirty-year-old sentencing law is unconstitutional. A prisoner argued the law violated his Sixth Amendment right to trial by jury, and his 14th Amendment right to due process of law. The United States Supreme Court agreed in a 6-3 ruling that if a California judge enhanced a sentence without a finding by a jury, the enhancement is illegal and unconstitutional. In fact, California courts have routinely added enhancements to defendants' sentences subsequent to plea agreements and bench trials. In light of the new decisions, the door is potentially open (for prisoners who fit the criteria) to have their case reviewed. The California Attorney General's office stated that "potentially thousands of California inmates could go home early."

If a judge enhanced your sentence, and the jury did not find that there should be one, or you entered a guilty plea with an enhancement, you may be eligible to have the enhancement stricken. If you are one of these prisoners and feel that you have been unconstitutionally sentenced to an aggravated term you should contact an attorney immediately. You still do have constitutional rights. ★

*The Law Office of Buddy Clark*
*14252 Beach Boulevard*
*Westminster, California 92683*
*(714) 901-7535 - (800) 808-3215*



PELICAN BAY STATE PRISON
5905 Lake Earl Dr
Crescent City CA 95532

UNITED STATES POSTAGE
PITNEY BOWES
02 1M                $ 02.53⁰
0004217866      AUG 25 2008
MAILED FROM ZIP CODE 95531

CONFID



CRESCENT CITY, CA. 95532
PO BOX 7500
PELICAN BAY STATE PRISON
CDC NO. C-41331 HOUSING D-1-112
NAME James Earl Harvey



CONFIDENTIAL LEGAL MAIL

Honorable Vaughn R. Walker
Northern Dist. of Ca.
Courthouse
Golden Gate Ave.
Francisco, Ca. 94102-3483

